UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| SAMUEL KERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:20-cv-202 |
| | ) | |
| VERMONT LAW SCHOOL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR A PRELIMINARY INJUNCTION**
**(Doc. 6)**

Plaintiff Samuel Kerson seeks a preliminary injunction preventing Defendant Vermont Law School ("VLS") from installing a permanent barrier of acoustic panels in front of two large murals painted by Plaintiff and his assistants in 1993. (Doc. 6.)

In seeking preliminary relief, Plaintiff must establish (a) irreparable harm and (b) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground of litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir. 1979)). Both formulations require Plaintiff to make an initial showing that he is likely to prevail or, at least, that the outcome is seriously in dispute.

In this case, the statute on which Plaintiff relies—the Visual Artist Rights Act, 17 U.S.C. § 106A et seq.—does not provide the protection he seeks against VLS's intended course of action. Without a legal basis for the relief he seeks, Plaintiff cannot demonstrate either a likelihood of success on the merits or a serious question going to the merits. For this reason, the court denies the motion for a preliminary injunction.

**Facts**

The relevant facts are not in dispute.

**I.      Creation of the Murals**

In 1993, the artist Samuel Kerson, assisted by other artists and community members, including school children, painted two large murals on the walls of Chase Hall at Vermont Law School ("VLS.") (Doc. 1 ¶¶ 18–20.) The murals depict the evils of slavery and the role of Vermont citizens in supporting the Underground Railroad. The work consists of two monumental panels, each 8 feet by 24 feet, painted in acrylic medium directly onto the sheetrock. Each panel contains four scenes. The first panel is entitled *Slavery*. The scenes depict the capture of people in Africa; their sale in the United States; slave labor; and a slave insurrection. (Doc. 6-2 at 7.) The second panel is entitled *Liberation*. (*Id.* at 8.) The four scenes include images of Harriet Beecher Stowe, John Brown and Frederick Douglas; Harriet Tubman arriving in Vermont; South Royalton residents sheltering refugee slaves; and Vermonters providing assistance to escaped slaves. The figures are painted in a style similar to animation that exaggerates features of the human figures. A reproduction of the murals is attached to this order.

**A.      Student Complaints and the Decision to Remove the Murals from View**

Over time VLS has received increasing numbers of complaints from students, both Black and white, concerning the murals. VLS has submitted a declaration from Associate Dean Shirley Jefferson about her experience in counseling students about their concerns. Students have spoken to her about the "cartoonish" depiction of the enslaved African people, particularly their faces. Students expressed complaints in 2013 at a meeting of the VLS Diversity Committee which Dean Jefferson chairs. Following complaints in 2014, VLS attached plaques to the wall

"explaining the purpose of the mural and its intent to depict the shameful history of the slavery as well as Vermont's role in the Underground Railway." (Doc. 11-2 ¶ 6.)

Between 2013 and the spring of 2020, Dean Jefferson heard additional complaints. She advised students to ignore the murals and focus on their studies. Following the death of George Floyd in early 2020, however, she realized that she "could no longer urge the students to overlook what the mural's presence said about the atmosphere at VLS for students of color." (Doc. 11-2 at 8.) She and VLS President Thomas McHenry agreed that the murals should be removed. Their decision coincided with a student petition calling for the removal of the murals. (*See* Doc. 11-4.)

On August 5, 2020, President McHenry sent Mr. Kerson a letter notifying him of the school's intent to remove or cover the murals permanently. (Doc. 6-4.) President McHenry gave Mr. Kerson the opportunity to remove the murals himself and offered to return full ownership to him. This lawsuit followed.

The murals are currently covered by a tarpaulin. The two sides agree that the sheetrock cannot be removed without damaging the murals. VLS proposes to cover the murals permanently by building a frame which will support acoustic panels. The panels will permanently conceal the murals from view. Neither the frame nor the panels will actually touch the murals. In Plaintiff's counsel's expression, the murals will be entombed within Chase Hall—still in existence but impossible to see.

Public response to VLS's decision has been mixed. Plaintiff has provided statements from students and others who object to the removal of the murals from view. (*See* Doc. 14-1.)

## II.      The Visual Artist Rights Act, 17 U.S.C. §§ 106A, 113

The protection of the reputational interest of the artist in the attribution and integrity of his or her work was first recognized in European law. This interest is often described as one of moral right. "The rights spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995). Article 6*bis* of the Berne Convention for the Protection of Literary and Artistic Works gave explicit protection to the artist's moral right:

> Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

Berne Convention for the Protection of Literary and Artistic Works art. 6*bis*, July 14, 1967, 11850 U.N.T.S. 828. In 1988, the United States joined the Berne Convention in order to improve international copyright protection for American authors and artists. The Senate action acceding to the Convention excluded the doctrine of moral rights from the legal principles accepted by the Unites States in joining the convention. *See* Senate Report No. 100-352 (1988).

In 1990, Congress passed the Visual Artist Rights Act, 17 U.S.C. §§ 106A and 113(d) ("VARA"). It forms part of the Copyright Act, 17 U.S.C. § 101 et seq., which establishes the legal framework in American law for the protection of visual art and literature. In contrast to other provisions of the Copyright Act that protect the artist's economic interests, the VARA protects the reputational interest of the artist. The VARA "is analogous to Article 6*bis* . . ., but its coverage is more limited." *Quality King Distributors, Inc. v. L'anza Research Intern., Inc.*, 523 U.S. 135, n.21 (1998).

4

The VARA follows the Berne Convention in protecting the identity of the artist as the creator of the work as well as providing protection against alteration or destruction. "With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of 'recognized stature,' the right to prevent destruction." *Carter*, 71 F.3d at 83. Protection is limited to the lifetime of the artist and is not transferable to others.

The two rights which Plaintiff seeks to protect in this case concern integrity and the threat of destruction of the murals. "The right of integrity 'allows the author to prevent any deforming or mutilating changes to his work.'" *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Buchel,* 593 F.3d 38 (1st Cir. 2010) (quoting *Carter*, 71 F.3d at 81). Destruction for purposes of the VARA "is defined as 'to tear down or break up.'" *Board of Managers of Soho Intern. Arts Condominium v. City of New York*, No. 01-cv-1226-dab, 2005 WL 1153752, at *3 (S.D.N.Y. 2005) (quoting *American Heritage Dictionary of the English Language* (4th ed. 2000). The provisions relevant to this dispute are 17 U.S.C. §§ 106A(a)(3), (c) and 113(d).

Section 106A(a)(3)(A) gives an artist the right to take legal action "to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation . . . ." Subsection 106A(a)(3)(B) extends the protection of the Act to "prevent any destruction of a work of recognized statute, and any intentional or grossly negligent destruction of that work . . . ."

VARA contains exceptions not directly relevant here. These include the modification of an artwork through the passage of time or the inherent nature of the materials and modification due to conservation or the conditions of public presentation such as lighting and placement as well as the exclusion of reproductions. 17 U.S.C. § 106A(c)(1)–(2). An artist may waive the

protections of VARA. *Id.* § 106A(e). Advertising materials and works for hire are also excluded. *Pollara v. Seymour*, 344 F.3d 265 (2d Cir. 2003).

A.   **The Exception for Artwork Incorporated Into a Building**

Section 113(d) creates specific rights for works such as murals which are "incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work . . ." 17 U.S.C. § 113(d). Such works are not protected by the VARA if the artist consented to the installation of the work *before* the effective date of the VARA (June 1, 1991) or if the artist and owner of the building executed a waiver "that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal. *Id.* § 113(d)(1)(B). For works installed after the effective date of the VARA and in the absence of a waiver, the VARA distinguishes between works which can be removed without harm to the artwork and those which will be damaged. If a work can be safely removed, the owner is required to notify the artist and permit a 90-day period for removal. If the work cannot be removed without damage—as here—it is subject to the same protections afforded a painting or other artwork.

The court applies § 113(d) to this case as follows. First, the work was created after the effective date of the VARA and it was not the subject of a waiver. The VARA applies. It is not a work which can be safely removed. It is painted on sheetrock which is easily damaged. Neither party contends that the two large panels can be removed safely. The 90-day warning period and right to remove do not apply. Instead, the murals are subject to VARA protection in the same manner as any other work of art which is not incorporated into the building.

### III. Plaintiff's Claim

Plaintiff contends that the VARA protects the murals from concealment behind acoustic panels because that treatment represents a modification or destruction of the work. Defendant responds that the VARA imposes no duty on VLS to continue to display the murals. So long as the panels are not damaged, they may be removed from public view in the same manner that a canvas or sculpture may be removed from display.

The court applies familiar principles of statutory construction in determining the scope of protection afforded by the VARA. These principles send us to the words of the statute. Only if these are ambiguous is there need for further interpretation.

### A. The Murals are Works of Recognized Stature

The first issue is whether the murals are works of recognized stature subject to protection against destruction by 17 U.S.C. § 106A(a)(3)(B). If they are not, then the only protection is protection of "intentional distortion, mutilation, or other modification . . . prejudicial to [the artist's] honor or reputation." 17 U.S.C. § 106A(a)(3)(A). For purposes of preliminary relief, the court is satisfied that the murals qualify as works of recognized stature.

Plaintiff has provided evidence that the murals have been reviewed in the *Christian Science Monitor* and the *Boston Globe*. (*See* Doc. 6-3.) The review in the *Monitor*, dated September 27, 1993, described the painstaking design and execution of the murals as well as the completed effect: "Kerson's style is heavily symbolic, with exaggerated human figures that burst with energy. The colors are piercingly bright, the result of special blended acrylics." (Doc. 6-3 at 3.) The review is entirely favorable and praised VLS for "welcom[ing] the mural and its theme of injustice thwarted. The artist's political aims—to provoke questions and discussion through his painting—were right at home there." (*Id.* at 4.)

The review in the Boston Globe, dated July 18, 1993, focused on the social message of the murals. "The mural is a tool for examining the connections between the struggle of black Americans and women's suffrage." (Doc. 6-3 at 5.) The reviewer drew connections between the murals and the works of the great Mexican muralists Diego Rivera and Jose Clemente Orozco.

Turning to more contemporary sources, Plaintiff has supplied a declaration from the Hon. Marilyn Skoglund, who has played a prominent role in the exhibition of art in Vermont in recent decades. (Doc. 6-6.) Justice Skoglund states that the murals "demonstrate Sam [Kerson's] stature as an accomplished and important Vermont artist. I believe that the subject matter remains as vital and important today as when the mural was installed 25 years ago, perhaps more so." (Doc. 6-6 at 2.) Plaintiff has also provided a declaration from David Schutz, Vermont's State Curator. Mr. Schutz states that "the murals are important works that show the artist at his best." (Doc. 6-7 at 2.)

VLS has provided no contrary evidence on the issue of "recognized stature."

Plaintiff's evidence, including reviews in major newspapers and the assessment of two witnesses with experience in selecting and exhibiting visual art, demonstrate "not only the work's artistic merit but also that it has been recognized as having such merit." *Scott v. Dixon*, 309 F. Supp. 2d 395 (E.D.N.Y. 2004); *see also Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166 (2d Cir. 2020) (holding that " a work is of recognized stature when it is one of high quality, status, or caliber that has been acknowledged as such by a relevant community," which "will typically be the artistic community, comprising art historians, art critics, museum curators, gallerists, prominent artists, and other experts"). The court concludes that Plaintiff is likely to succeed at trial in establishing that the murals are works of recognized stature subject to the VARA's protection against destruction.

### B.     Concealment Behind the Acoustic Panels is Not Prohibited by the VARA.

The second issue is whether the concealment of the murals behind acoustic panels is an act of modification or destruction barred by the VARA. The question has two aspects. The first is whether, as a matter of art conservancy, placing the murals behind the acoustic panels will cause the work to deteriorate. Prior to the preliminary injunction hearing, the court required VLS to furnish a detailed explanation, including a sketch, of the design and installation of the acoustic panels and their supporting frame. (*See* Doc. 13-2.) Neither the frame nor the panels will touch the murals. Through counsel, Plaintiff has expressed concern that placing the murals behind a fixed wall without air circulation might cause the sheetrock to deteriorate, but he has provided no support for such an assertion. For purposes of the preliminary injunction, the court concludes that there is no evidence that physical deterioration will result from concealing the murals behind a fixed wall of acoustic panels.

The second issue is whether concealing the murals is a form of modification or destruction which is prohibited by the VARA. Plaintiff contends that the act of walling the murals away from public view will damage his standing and reputation—exactly the type of injury which the VARA seeks to prevent. VLS responds that art is frequently removed from exhibition and the law school has no obligation to continue to display art which offends viewers, including the law students who have complained for years about its depiction of Black bodies and faces.

To resolve this issue the court turns to the conventional meanings of the words in the statute. Both "modify" and "destroy" are words in common usage with distinct meanings. Modify means to alter or change an object. It does not mean to conceal it from view. Concealment may be a consequence of modification—as when camouflage is applied to a

vehicle—but it is an act separate from modification. We might tell a child to hide as part of a game, but we would not tell her to modify herself from view. In the context of artwork, modification means alteration of the physical art object. In the limited case law available concerning the VARA, an owner's decision to conceal a work does not constitute modification or mutilation. *See Massachusetts Museum of Contemporary Art Foundation*, 593 F.3d at 62 ("In our view, a finding that the Museum's covering of the installation constituted an intentional act of distortion or modification of [the artist's] artistic creation would stretch VARA beyond sensible boundaries."); *cf. Tobin v. The Rector*, No. 17 CIV. 2622 (LGS), 2017 WL 5466705, at *5 (S.D.N.Y. Nov. 14, 2017) ("[r]elocating . . . does not by itself constitute distortion, mutilation or modification under VARA."), *aff'd sub nom on other grounds, Tobin v. Rector, Church-Wardens, & Vestrymen of Trinity Church*, 735 F. App'x 32 (2d Cir. 2018).

Destroy is an easier word to define in the context of the VARA. It means to damage in an irreparable fashion as in burning, tearing or discarding an artwork. It does not mean to remove from display or to place in storage. In this case, VLS intends to withdraw the murals from exhibition—permanently—but they continue to exist and cannot reasonably be considered to have been destroyed. *See English v. BFC&R E. 11th St. LLC*, No. 97-cv-7446 (HB), 1997 WL 746444, at *6 (S.D.N.Y. Dec. 3, 1997) (rejecting the argument that permanently "obliterating a visual artwork from view [via construction] is the equivalent of destroying it"), *aff'd sub nom. on other grounds*, English *v. BFC Partners*, 198 F.3d 233 (2d Cir. 1999). Interior walls are rarely permanent. Certainly the wall designed in this case is not. If VLS changes its mind and decides to restore the murals to view during the period of protection afforded by VARA, they will remain unchanged and available for that purpose.

Because the VARA is explicit in the actions which it prohibits, the court concludes that Plaintiff is unlikely to prevail in his effort to extend the protection of the Act to additional acts not expressly addressed. The Berne Convention provides a contrasting approach. It authorizes the artist to object to "any distortion, mutilation or other modification of, *or other derogatory action in relation to,* the said work, which would be prejudicial to his honor or reputation." Berne Convention art. 6*bis*(1), 11850 U.N.T.S. at 235 (emphasis added). Concealing a pair of murals behind a permanent wall may qualify as "derogatory action." It is a statement that the murals no longer merit a place within the law school community. But Congress did not enact the Berne Convention. It chose to implement more limited protections which do not prohibit the actions proposed by VLS.

The court concludes that Plaintiff is unlikely to succeed on the merits in this case. Plaintiff is unlikely to obtain a final judgment from this court enjoining the construction of the wall of acoustic panels because the language of the VARA does not include a protection against concealment or removal from display of artworks by the owner. For this reason, the court denies the motion for a preliminary injunction. It is unnecessary to consider the remaining element of irreparable harm.

## **Conclusion**

The motion for preliminary injunction is DENIED.

Dated at Rutland, in the District of Vermont, this 10th day of March, 2021.

Geoffrey W. Crawford, Chief Judge
United States District Court