IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| SAMUEL KERSON, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  5:20-cv-00202-gwc |
| ) | |
| VERMONT LAW SCHOOL, INC., ) | |
| Defendant. ) | |
| ) | |

**VERMONT LAW SCHOOL, INC.'S REPLY
IN SUPPORT OF MOTION TO DISMISS**

Kerson's Opposition rests to a large degree on the proposition that, because he has alleged that covering the Mural will violate VARA—an allegation that, he contends, "must be accepted as true," *see* Opposition at 1—his Complaint may not be dismissed for failure to state a claim.  This is manifestly incorrect.  The Court need not accept as true his conclusions of law as to the scope of VARA's prohibitions—and, indeed, in ruling on Kerson's Motion for a Preliminary Injunction, the Court has expressly rejected Kerson's reading of the statute.  For good reason: despite multiple opportunities, Kerson has yet to produce a single legal authority suggesting that VARA denies the owner of a work of art the right to remove the work from display by covering it, as VLS intends to do.  Kerson appears to be alone in his interpretation of the statute.

It is difficult to overstate the radical nature of Kerson's construction of VARA.  As his counsel acknowledged at the preliminary injunction hearing, under Kerson's reading of the law, institutions hosting a work of art would be legally required to continue to display that work during the artist's lifetime no matter how

the meaning, social context, and impact of the work might change.  Private institutions would be captive, shackled to the public display of works that become, over time, widely accepted to be offensive and inconsistent with institutional and societal values, such as Dartmouth College's Hovey murals.[1]  The only exceptions of which Kerson admits are "museums and galleries," which he contends alone retain the right to decide whether or not to display a work.  This position lacks the slightest grounding in the actual language of the statute—and, beyond that, presents grave First Amendment concerns.  As Kerson has failed to establish any legal basis to proceed on his VARA claims, the Complaint should be dismissed.

### A.     The Actual Factual Allegations of the Complaint Do Not Make Out a Violation of VARA.

Kerson's Opposition advances three distinct arguments that he has stated a colorable claim.  None holds water.

The first and primary argument is that, contrary to basic principles of federal procedure, the Court must "accept[] as true" the Complaint's allegations that covering the Mural violates VARA.  *See* Opposition at 1, 6-7.  Not so.  It is blackletter law that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Whether VARA offers Kerson a remedy for covering his work is a question of law that turns on interpretation of the statute; his bare assertions that covering constitutes a violation of the law are thus immaterial.

---

[1] *See* https://news.dartmouth.edu/news/2018/09/consultative-process-leads-hovey-murals-move (last accessed Mar. 5, 2021).

Second, Kerson argues in passing that there is a possibility that installation of a cover affixed to the wall structure "could involve pasting or gluing the panels directly on the wall surface, thereby destroying, modifying, or distorting the images" in violation of VARA.  Opposition at 7.  However, the pleading standard requires "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  The theory that a cover might possibly be glued to the wall and cause physical harm to the Mural is entirely speculative[2]—not to mention contrary to the facts submitted to the Court on Mr. Kerson's preliminary injunction motion—and does not provide a colorable basis for allowing the suit to proceed.

Third, Kerson argues that covering a work of art "in and of itself, distorts, mutilates, or otherwise modifies the work," thereby violating VARA.  Opposition at 9.  This argument, which lies at the heart of his suit, has been rejected by the Court in its March 10 Order denying Kerson's request for a preliminary injunction.  Kerson's Opposition to the Motion to Dismiss offers no reason to revisit that sound analysis.  The Opposition fails to offer a single authority endorsing Kerson's idiosyncratic interpretation of the statute, nor does it engage with the language of § 106A(a)(3) and attempt to explain *why* the plain language of the statute could be read to prohibit covering.  The sole inspiration for Kerson's position appears to be a statement from a congressperson included in the House Report on VARA that "[i]t is

---

[2] The (incorrect) suggestion that a cover might be glued to the Mural—or that covering might result in physical harm to the Mural generally—is nowhere to be found in the actual allegations of the Complaint.  The Complaint alleges only that *removal* of the Mural would result in physical harm to the work.  *See* Complaint, ¶¶ 32-34, 42.  While the Complaint notes VLS's plan to cover the Mural with acoustical panels "firmly affixed to the wall *structure*," *id.* ¶ 35, it makes no allegation that affixing a cover to the wall structure will involving "pasting or gluing" panels onto the *Mural* or otherwise cause physical harm to the Mural itself, nor is there any factual basis to draw such an inference.

often through art that we are able to see truths, both beautiful and ugly." Opposition at 8. From this anodyne observation, Kerson conjures the conclusion that "Congress clearly recognized that visual art not only must be protected and preserved, but also seen," and that "[c]oncealment of art . . . clearly violates this objective." *Id.* That extrapolated proposition finds no support in the statement Kerson cites—let alone the text of the enacted statute or any case law interpreting it.

And, to be certain, there are decided cases on point, notwithstanding Kerson's assertion that VLS's position is not "supported by . . . case law." Opposition at 8. The *Buchel* and *Pembroke* cases[3] admittedly did not involve artwork incorporated into a building, but it is unclear—and Kerson does not explain—why that fact should have any bearing on the right to cover a work. If anything, VARA is *more* solicitous of the rights of owners of works incorporated into buildings, imposing limitations on the Act's scope that apply only to such works. *See* 17 U.S.C. § 106A(a)(3) (establishing rights against destruction and modification "*subject to the limitations* set forth in section 113(d) [addressing works incorporated in to buildings]" (emphasis added)). There is nothing in the statute that would support the counterintuitive conclusion that Congress intended to grant an owner of such a work *lesser* rights to withdraw it from display than the owner of a framed painting or freestanding sculpture.

---

[3] *Massachusetts Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010); *Phillips v. Pembroke Real Est., Inc.*, 288 F. Supp. 2d 8 (D. Mass. 2003).

While Mr. Kerson highlights the factual differences between *Buchel* and the present case, those differences simply reinforce the conclusion that VARA does not apply here. As Kerson notes, *Buchel* involved an imperfect attempt to cover an art installation that left part of the work visible, akin to "hiding an elephant behind a napkin." Opposition at 10 (quoting *Buchel*, 593 F.3d at 61). As such, the artist in *Buchel* had at least a plausible argument that the incomplete covering constituted "an aesthetic modification of the artwork that gave . . . patrons a distorted view of it." *Buchel*, 593 F.3d at 61. The First Circuit nonetheless concluded that covering the work could not be construed as an act of distortion or modification. *Id.* Here, where the planned cover would completely remove Mr. Kerson's work from view and leave nothing to be perceived—thus avoiding any distortion or modification of the manner in which the work was viewed—*Buchel*'s conclusion has even greater force.[4]

### B. The Public Presentation Exception Applies to VLS's Decision to Remove the Mural from Display.

The Opposition contends that the discretion to control public presentation of a work of art is a right exercised solely by "galleries and museums" and is not available to VLS. Opposition at 11. This argument lacks the slightest foundation in the text of the statute, and to entertain it would stretch the Act's legislative history beyond all reasonable bounds. The applicability of the "public presentation" exemption here is straightforward: to the extent that covering could even plausibly

---

[4] Kerson also attempts to cast doubt on *Pembroke*'s conclusion that VARA does not give artists the right to public presentation of their work by citing discussion from the Seventh Circuit's decision in *Kelley v. Chicago Park District*, 635 F.3d 290 (7th Cir. 2011). That discussion was pure dicta: the panel held that VARA did not apply on other grounds, noted it did not need to reach the question of whether site-specific art fell within VARA's protections, and nonetheless proceeded to offer some thoughts on why it viewed the First Circuit's approach as "open to question." *Id.* at 306. Regardless, the panel had nothing to say on the question here—namely, whether VARA permits covering a work.

5

be deemed a "modification" of a work within the meaning of § 106A(a)(3), the "public presentation" exemption expressly reserves to the work's owner the right to make decisions as to how—and whether—to display a work, regardless of the owner's identity.

To place the argument in context, it is helpful to start with the complete text of the passage from the House Report on VARA that Kerson cites:

> Proposed section 106A(c) takes into account current practices of the artistic community and supplements the exclusions set forth in the definition of a work of visual art. . . . [S]ubsection (c)(2) excludes a modification due to conservation efforts and to the presentation of the work, including lighting and placement, unless the modification was grossly negligent. Generally, the removal of a work from a specific location comes within the exclusion because the location is a matter of presentation, unless the work cannot be removed without causing the kinds of modifications described in proposed subsection 106A(a)(3). Under subsection (c)(2), galleries and museums continue to have normal discretion to light, frame, and place works of art. However, conduct that goes beyond presentation of a work to physical modification of it is actionable. For example, Representative Markey described the actions of two Australian entrepreneurs who cut Picasso's "Trois Femmes" into hundreds of pieces and sold them as "original Picasso pieces." This is clearly not a presentation question. On the other hand, the Committee believes that the presentation exclusion would operate to protect a Canadian shopping center that temporarily bedecked a sculpture of geese in flight with ribbons at Christmas time.

H.R. Rep. No. 514, 101st Cong., 2d Sess. 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6927. Several things are evident here. To start with, the discussion unambiguously reflects that removal of a work from display was intended to fall within the presentation exemption, unless it causes damage or modification to the work. There is no indication in the Report or text of VARA that this exception was limited to certain categories of art owners; rather, the overarching intent was to

accommodate "current practices of the artistic community," which would include private art collectors and owners such as VLS as well as museums and galleries.

The passage does call out museums and galleries specifically and confirms that they will retain their ability to control how to present art work—but it does not suggest any intent to exclude other owners. It is reasonable to assume that these two institutions were highlighted as examples because museums and galleries display artwork publicly and are the most likely to be subject to a complaint that changes in the manner of displaying a work have modified its presentation. It almost surely did not occur to Congress—and this passage reflects no consideration of the possibility—that the law might be read to restrict private individuals and institutions from choosing whether or not to display art.

Perhaps most significantly, the passage also sheds light on the type of "distortion, mutilation, or . . . modification . . . prejudicial to [the artist's] honor or reputation" that Congress had in mind when it drafted §106A(a)(3): specifically, a "physical modification" that mutilates or distorts the manner in which the artwork is perceived, such as (in the given example) cutting a Picasso into hundreds of pieces. In contrast, the passage confirms that a change that does not physically alter the work itself—even one that changes its presentation, such as tying ribbons to a sculpture—generally lies outside the scope of the statute. Given these examples, there can be little question that the decision to place a cover over a work that completely removes it from view but does not physically alter it falls within the public presentation exception and is not actionable under VARA.

### C. The Absence of a Written Agreement Permitting Destruction of the Work Is Irrelevant to Plaintiffs' Claim.

The Opposition places great emphasis on the fact that VLS did not negotiate at the time the mural was installed a written agreement with Kerson allowing removal of his work at some later time. That is true—and wholly irrelevant. Section 113(d)(1)(B) simply establishes a safe harbor for building owners, authorizing a work to be removed if a written agreement exists under which the artist acknowledged and consented to the possible future removal of the work and attendant risk of destruction or modification. VLS has not claimed, and could not, that it falls within that safe harbor and is thereby entitled to destroy Kerson's work. The existence or nonexistence of an agreement has no bearing, however, on whether installing a cover over work constitutes a "distortion, mutilation, or . . . modification" prohibited by VARA. As the Court has already answered that question in the negative, VLS is entitled to proceed without Kerson's agreement.

### D. The Canon of Constitutional Avoidance Favors Dismissal.

Lastly, the Opposition's attempt to dodge the conflict between the First Amendment and Kerson's unique interpretation of VARA misapprehends the significance of that constitutional question to the issues before the Court. Kerson contends that VLS's "constitutional challenge to VARA must be resolved at trial" as, at this stage, "there is no basis for this court to entertain VLS's potential constitutional argument." Opposition at 12-13. This is incorrect for two reasons.

First, VLS is not asserting a "constitutional challenge" to VARA. Instead, it is advocating *avoidance* of a constitutional issue: VLS contends that the doctrine of

8

constitutional avoidance requires the Court to weigh the serious constitutional implications of interpreting the statute in the manner Kerson advocates. The doctrine functions as "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."[5] *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). "Under the doctrine, when a court is confronted with two plausible constructions of a statute, . . . 'that court must adopt the construction that avoids the constitutional issues.'" *United States v. Martinez*, 525 F.3d 211, 215–16 (2d Cir. 2008) (quoting *Clark*, 543 U.S. at 380). Here, even if Kerson offered a plausible construction of the statute, the First Amendment issues his reading presents would strongly weigh against adopting it.

Second, the application of the doctrine to interpretation of VARA does not present any issues that require factual development that would have to be resolved at trial. The constitutional issue appears on the face of Kerson's interpretation: his reading would absolutely compel a private owner of artwork to continue to display a work during the artist's lifetime, no matter how inconsistent the work might be with the owner's values and viewpoint. The choice of what art to display—or to remove from display—is undeniably expressive conduct, and ordinarily would lie firmly beyond the constitutional authority of Congress to prescribe: "Since *all* speech inherently involves choices of what to say and what to leave unsaid," an "important manifestation of the principle of free speech is that one who chooses to

---

[5] Kerson's invocation of the presumption that Congress "passed statutes that are constitutional" (Opposition at 12)—far from undermining VLS's argument—is thus entirely consistent with the rationale for applying the doctrine of constitutional avoidance.

speak may also decide what not to say." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citation and quotation marks omitted).

Mr. Kerson's sole rejoinder is that, because VLS originally invited the speech at issue, it cannot be heard to complain when, thirty years later, it has determined that the work is no longer consistent with its mission and values.  This cannot be so.  Respect for "the individual autonomy of intellect and will" lies at the core of the First Amendment, *Carroll v. Blinken*, 957 F.2d 991, 996 (2d Cir. 1992), and inherently includes the right to change one's mind.  To interpret VARA in a manner that shackled private institutions and individuals to a particular point of view for decades, prohibiting a change of conscience, would be fundamentally at odds with the First Amendment.  The Court should reject such a construction.

Dated at Burlington, Vermont this 10th day of March, 2021.

> By  */s/ Justin B. Barnard*
> Karen McAndrew, Esq.
> Justin B. Barnard, Esq.
> DINSE
> 209 Battery Street
> Burlington, VT  05401
> 802-864-5751
> kmcandrew@dinse.com
> jbarnard@dinse.com
>
> *Counsel for Vermont Law School, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2021, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system. The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Richard Rubin, Esq.
rrubin@rkmvlaw.com

Steven J. Hyman, Esq.
shyman@mclaughlinstern.com

Dated:  March 10, 2021                         /s/ *Justin B. Barnard*
                                               Justin B. Barnard, Esq.