## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **SAMUEL KERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.  5:20-cv-00202-gwc** |
| | ) | |
| **VERMONT LAW SCHOOL, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PLAINTIFF SAMUEL KERSON'S
### RESPONSE TO DEFENDANT VERMONT LAW SCHOOL INC.'S
### SUPPLEMENTAL FILING IN SUPPORT OF SUMMARY JUDGMENT

By Entry Order dated March 11, 2021, the Court converted Defendant Vermont Law

School's ("Defendant" or "VLS") Motion to Dismiss to a Motion for Summary Judgment in

order to consider the multiple exhibits submitted by both sides in connection with the motion for

a preliminary injunction. The Court permitted Defendant to supplement its motion papers and

Plaintiff Samuel Kerson ("Plaintiff" or "Kerson") to respond.

By this Response Memorandum, Plaintiff submits that,

1) It is premature for the Court to decide the Motion for Summary Judgment as the current

record is insufficient to make a determination as to whether or not VLS's proposed

concealment of the Murals, entitled *The Underground Railroad, Vermont and the

Fugitive Slave* (the "Murals"), painted by Plaintiff, on walls of Chase Hall on the VLS

campus, will destroy or damage the Murals;

2) That the Court, therefore, should

1

a)     defer considering the Motion for Summary Judgment or deny it; or

b)     allow Plaintiff time to obtain affidavits or declarations or take discovery relevant to this genuine issue of fact.

3) Alternatively, that the Court rule, that the Visual Rights Act, 17 U.S.C. §106A ("VARA") provides, as a matter of law, the relief that he seeks, to wit, to prevent VLS from installing a permanent barrier of acoustic panels concealing and entombing the Murals.

## I.    <u>FACTS AND PROCEDURAL HISTORY</u>

The facts are set forth in this Court's *Order On Motion For A Preliminary Injunction*, issued on March 10, 2021 ("Court P.I. Order").  VLS's March 22, 2021 filing ("VLS Supplemental Filing"), at p. 4, confirms that once it has constructed the proposed barrier, concealing the Murals, it does not intend to display the Murals in the future.

Kerson filed this action on December 2, 2020, asserting his rights under VARA and the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2203, seeking an injunction preventing any intentional or negligent destruction, distortion, mutilation, or other modification of the Murals during his lifetime. Kerson took this action because of VLS's stated plans to take measures that would effectively destroy the Murals. VLS initially publicly announced that it planned "to paint over" the Murals, thereafter, planned to remove the Murals from Chase Hall.  and, finally, after it had been determined that the Murals could not be removed without damage, advised that it intended "to cover the Murals with acoustical panels that will be firmly affixed to the wall structure."

Based on the facts known at that time, *e.g.* that VLS intended "to cover the Murals with acoustical panels that will be firmly affixed to the wall structure", Kerson moved for a Preliminary Injunction on January 15, 2021. A hearing was held on February 24, 2021. On February 12, 2021, prior to the hearing, VLS provided a Declaration and accompanying drawings, purporting to show that the concealment can be accomplished without destroying or damaging the Murals. (As shown in the attached Declaration of Daniel Hecht, *see infra*, the VLS Declaration raises more questions than it answers to make that determination.) Then, on February 2, 2021, rather than filing an Answer[1], VLS moved to dismiss Kerson's complaint. Kerson responded on March 3, 2021.

The Court P.I. Order denied Plaintiff's Motion for a Preliminary Injunction. Although agreeing with Plaintiff's position on several key grounds, it concluded that because VARA does not explicitly prohibit the concealment of the Murals proposed by VLS, Plaintiff has no legal basis for the relief that he seeks and, therefore cannot demonstrate either a likelihood of success on the merits or a serious question going to the merits.

The Court side-stepped the fundamental concern raised in the Complaint; namely, the likely destruction of the murals, by assuming that the ever-evolving plan for a wall would cause no harm. The Court reached this conclusion before an answer was filed, before the final and latest plans were submitted, before Plaintiff could have experts analyze the proposal, before discovery could be done, and only a few weeks after VLS changed the plans and first proposed a wall which it says will not touch the surface of the murals.

---

[1] Because an Answer is yet to be filed, there has been no opportunity to take discovery.

The legal issue of whether the concealment of the murals violates VARA is relevant, but only after the Court first decides that the proposed wall to conceal will not cause damage to the painted surfaces. That question remains open and is the essence of this case. The Court asked Mr. Hyman if he could explain whether or how the proposed wall might damage the murals. This question, although reasonable, was premature. Plaintiff had no time to even consider the effect of the "new" design on the murals. The first plan was to permanently affix (glue) the panels to the walls. The Complaint and Motion for a Preliminary Injunction was premised on that earlier design.

## II.   A DECISION ON THE SUMMARY JUDGMENT IS PREMATURE AS THE CURRENT RECORD IS INSUFFICIENTLY DEVELOPED TO DETERMINE WHETHER OR NOT THERE ARE GENUINE FACTS IN CONTROVERSY

F.R.C.P. 12(d) provides "[i]f, on a motion under Rule 12(b)(6) or 12 (c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. Under Rule 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Here, VLS contends that the "undisputed facts establish that installation of the cover will not cause any legally cognizable modification, distortion, or destruction of the Mural in violation of VARA." VLS Supplemental Filing, pp. 1-2. To support this contention, VLS relies on the February 12, 2021 and March 22, 2021 Declarations of Jeffrey Knudsen. Plaintiff rejects this conclusion.

Rule 56(d) addresses the procedure governing a situation where facts are unavailable to the nonmovant essential to justify its opposition to the grant of summary judgment, as follows:

> (d)     When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Kerson submits that Rule 56(d) is relevant here. To effectively assert a Rule 56(d) defense to a summary judgment motion, the non-movant "must file an affidavit explaining (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine [dispute] of material fact, (3) what effort the affiant has made to obtain those facts, and (4) why [those efforts were] unsuccessful [.]" *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir.1989) (*citing Burlington Coat Factory Warehouse Corp*., 769 F.2d at 925–27). In compliance therewith, Kerson appends the Supplemental Declaration of Daniel Hecht[2] (Exhibit 1), that raises significant questions as to the accuracy of VLS's contention that its proposed concealment of the Murals will not damage or destroy the Murals as well as a Declaration by his attorney Steven Hyman (Exhibit 2), that states the efforts that Plaintiff has made to obtain those facts and why, to date, such efforts have been unsuccessful.

The Declarations meet the required standards under Rule 56(d). The Hecht Declaration raises legitimate questions concerning the required size of the panels, the mode of construction of the panels, whether the panels create a closed environment resulting in condensation issues, an issue

---

[2] Mr. Hecht's Declaration, dated January 15, 2021, filed in this action on January 20, 2021 as Exhibit 7 to Plaintiff's Motion for a Preliminary Injunction, sets forth Mr. Hecht's qualifications.

that VLS has conceded, the monitoring of VLS's proposed system to control humidity, the presence of vents, and how degradation of and damage to the Mural's paint is determined and, if necessary, repaired. Additionally, the Declaration raises legitimate questions as to whether the use of acoustic panels to conceal the Murals will cause an acidic atmosphere as well as trapping moisture behind the panels. As the Hecht Declaration notes, all of these concerns must be fully investigated and resolved before a determination can be made whether or not VLS's stated plan will damage or destroy the Murals.  Finally, the Hecht Declaration, at ¶4, reiterates VLS's ever changing position concerning the Murals. Clarity on that can only be obtained through discovery.

The Hyman Declaration sets forth Plaintiff's efforts to independently obtain answers to the questions raised in the Hecht Declaration and why these efforts have been unsuccessful. Kerson has met the requisite standards for relief under Rule 56(d) and asks the Court to either deny VLS's Motion for Summary Judgment or, alternatively, allow Kerson time to obtain affidavits or declarations and to take discovery on these genuine issues of fact.

### III. VARA PROVIDES AS A MATTER OF LAW THE RELIEF SOUGHT BY PLAINTIFF

#### A. Introduction

VLS proposes to install a permanent barrier of acoustic panels in front of the Murals, thereby concealing the Murals. Defendant has confirmed that it does not intend to display the Murals in the future. As fully discussed *supra*, at Section II, Plaintiff requires discovery to be able to determine whether there is genuine issue of material facts as to how the proposed concealment will physically impact the Murals. Regardless of the ultimate determination on this issue, VLS's proposed concealment of the Murals violates his rights under VARA.

6

As a preliminary matter, although the Court concluded, in the context of a preliminary determination, that Kerson is unlikely to succeed on the merits because VARA does not provide the protection he seeks, this is not the law of the case. The Court may make a new finding, based on a more complete record.

To determine whether the proposed concealment of the Murals is a modification and/or destruction, violating Kerson's VARA rights, it is insufficient to rely on the conventional meaning of the terms. Rather, a proper analysis must consider the specific context in which these terms are used, including the historical context and legislative history of VARA. The statutory language of VARA confirms that modification of a work of visual art is to be construed broadly, and is not limited to the alteration of the physical art object, as found by the Court.  Reading a "concealment exception" into the statue is mere speculation.

Additionally, as recognized by the Court (Court P.I. Order, p.p. 4-5, 11), the historical context of VARA must be considered including the United States' accession to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"). Congress's stated intent in enacting VARA, to protect the moral rights of certain visual artists in the works they create, consistent with the moral rights provision of the Berne Convention, confirms that concealing the Murals behind a permanent wall is a modification and, therefore, a violation of VARA. (The omission of "other derogatory action", in 17 U.S.C. §106A(a)(3)(A), simply reflects Congress's intent to limit works covered by VARA to visual works, rather than restrict the scope of what modification covers.)

A careful review of the cases relied upon by the Court to reach its preliminary determination shows that they do not control this dispute as they are distinguishable.

Finally, as found by the Court, the Murals (a) are a work of visual art, subject to the protections of VARA, (b) are a work of recognized stature, and (c) are not subject to any of the exceptions set forth in 17 U.S.C. ¶106A or 17 U.S.C. §113(d).

### B.  The Court P.I. Order is not the Law of the Case

The Court issued the Court P.I. Order in the context of a preliminary determination of a likelihood of success on the merits. Although VLS presumes that the Court "will affirm that ruling on summary judgment" (VLS Supplemental Filing, at p. 1), the Court is not required to do so. Rather, the Court may make a *de novo* finding, based on a more complete record.

As explained by the Supreme Court, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*, at 395. "A party thus is not required to prove his case in full at a preliminary-injunction hearing ..., and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits...." *Id.*, at 395.

Neither the Court's prior factual findings nor its conclusions of law are considered the law of the case. The reason for this is that "a preliminary determination of a likelihood of success

on the merits in a ruling on a motion for preliminary injunction is ordinarily tentative, pending a trial or motion for summary judgment. … It would therefore be anomalous at least in most cases, and here, to regard the initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions." *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir.1992) (*citations omitted*). *See, also; Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Casualty Co.*, 126 F.3d 727, 735–36 (5th Cir.1997) (noting effect of different evidentiary standards on direct appeal and on interlocutory appeal of preliminary injunction); *United States v. Local 560 (I.B.T.)*, 974 F.2d 315, 330 (3d Cir.1992) (holding that "a trial court, in deciding whether to grant permanent relief, is not bound by its decision ... about preliminary relief" and that "a decision on a preliminary injunction is, in effect, only a prediction about the merits of the case"); *Bd. of Trade v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1020 (7th Cir.1979), *cert. denied*, 446 U.S. 928 (1980) ("Refusal to stay a preliminary injunction does not establish the law of the case since it rests on nothing more than a tentative appraisal of the probable result on the merits.")

### C.  Determining the Meaning of Statutory Language Requires Analysis of the Context in which the Language is Used

#### 1.  Introduction

To interpret the meaning of words in a statute it is not sufficient to rely on the "conventional meaning of words." Rather, the context in which the language is used must be taken into account.  As taught by the Supreme Court in *Yates v. United States*, 574 U.S. 528 (2015), the meaning of a statute does not turn solely on dictionary definitions of its component

9

words.  Rather, "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, <u>and the broader context of the statute as a whole</u>." *Id*. at 537, *citing, Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997) (*emphasis supplied*).  Thus, although dictionary definitions of the words bear consideration, they are not dispositive of the meaning. *Id.*, at 538. *Accord, Tyler v. Cain*, 533 U.S. 656, 662 (2001) ([We do not] "construe the meaning of statutory terms in a vacuum."); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809(1989) ([We interpret particular words] "in their context and with a view to their place in the overall statutory scheme."); *Bloate v. United States*, 559 U.S. 196, 205, n. 9 (2010).(Dictionary definition of a disputed term cannot control).

### 2.  The Statutory Language Expressly Contradicts the Court's Conclusion that Modification Means Alteration of the Physical Art Object

The Court's analysis starts and stops with the "conventional meaning" of the words "modification" (or "modify") and "destruction" (or "destroy").  Based on this limited analysis, the Court concludes that each requires the physical alteration of the artwork, as follows:

1) "Modify to means to alter or change an object. It does not mean to conceal it from view … In the context of artwork, modification means alteration of the physical art object" (Court P.I. Order, pp. 9-10).)

2) "Destroy … means to damage in an irreparable fashion as in burning, tearing or discarding an artwork.  It does not mean to remove from display or to place in storage." (*See, also,* Court P.I. Order, at p. 5, defining destruction as "to tear down or break up.") (Court P.I. Order, p. 10).)

Because the Court finds that the proposed concealment does not physically alter the art object (as discussed *supra*, the present record is insufficiently developed to make this factual determination), the Court concludes that neither term is implicated by VLS's proposed concealment of the Murals.

*Yates* requires more than this limited analysis. It requires both an analysis of the statutory language and its legislative history.

As recognized by the Court, the rights granted by VARA to authors of a work of visual art, pursuant to 17 U.S.C. §106A(a)(3) are subject to specifically identified exceptions. It is to these exceptions that one must look to understand the meaning of "modification" and "destruction".

The exceptions set forth in 17 U.S.C. §106A(c)(2) are the most relevant. The subsection reads:

> (2)    The <u>modification of a work of visual art</u> which is the result of conservation, or of the public presentation, including the lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) <u>unless the modification is caused by gross negligence</u>. (*Emphasis supplied*)

Neither of the specifically mentioned examples of modification, "lighting and placement, of the work" are an "alteration of the physical art object". Thus, the Court's conclusion that "[i]n the context of artwork, modification means alteration of the physical art object" is contradicted by the language of VARA.  In other words, if the statute explicitly defines lighting and placement to be a modification, albeit a permitted one, how can one say that modification is restricted to physical alteration.

11

The legislative history of this subsection supports Plaintiff's position. 17 U.S.C. §106A(c)(2), the so-called public presentation exception, was included in VARA to allow museums and galleries to "continue to have normal discretion to light, frame, and place works of art" (House Report, at p. 6927). However, the "public presentation exception" is not open ended. In addition to the "gross negligence" limitation, Congress noted that "conduct that goes beyond presentation of a work to physical modification of it is actionable.". *Id.* The proposed intentional physical concealment of the Murals clearly is the type of conduct that is actionable.

The foregoing demonstrates not only that Congress defined "modification" expansively but also that Congress affirmatively created specific exceptions to this expansive definition. Concealment of the work of visual art is not one of the exceptions.

None of the other VARA exceptions exempt "concealment" from the definition of "modification". 17 U.S.C. §106A (c)(1) refers to a natural deterioration of the work due to the passage of time or the inherent nature of the materials used to create the work while 17 U.S.C. §106A(c)(3) involves works other than murals.

Separate exceptions to VARA rights are found in 17 U.S.C. §113(d), covering a work of visual art that has been incorporated in or made part of a building. Those exceptions are specific examples, none of which permit the permanent concealment of a mural like the Murals in Chase Hall.

If the work can be removed from the building without damage, the building owner can avoid the applicability of 17 U.S.C. §106A (a), as long as the owner complies with certain notice

12

provisions.  Because the Murals cannot be removed from Chase Hall without damaging them, as found by the Court, this exception does not apply.

On the other hand, where removal of the work of visual art from the building cannot be accomplished without damaging the work (the situation here), VARA requires a written instrument signed by the building owner and the artist that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or <u>other modification</u>, before such action can be taken. The proposed concealment of the Murals is an "other modification". Accordingly, VLS could have negotiated an appropriate written instrument with Kerson back in 1993, or thereafter. Having failed to do so, this Court should not permit VLS to do an end run around the clear language of VARA by creating a new exception, not intended by Congress.

### 3. Congress intended the Moral Rights of VARA to be Analogous to those Protected by Article 6bis of the Berne Convention

The legislative history of VARA confirms that the Moral Rights granted thereunder are intended to broadly protect the moral rights of the author of a qualifying work of visual art and that such rights transcend the physical alteration of the work.

As explained by the Court, (Court P.I. Order, pp. 4-5). the protection of an artist's moral rights, *e.g.,* the protection of the reputational interest of the artist in the attribution and integrity of the artist's work, has long been recognized by European Law. The Berne Convention gave explicit protection to such rights:

> Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

13

Berne Convention for the Protection of Literary and Artistic Works art. *6bis,* July 14, 1967, 11850 U.N.T.S. 828.

With the passage of VARA, in 1990, the United States formally recognized the moral rights of artists. The purpose of the legislation was to

> protect both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity." The former ensures that artists are correctly identified with the works of art they create, and that they are not identified with works created by others. The latter allows artists to protect their works against modifications and destructions that are prejudicial to their honor or reputations. These rights are analogous to those protected by Article 6bis of the Berne Convention, which are commonly known as "moral rights". The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation. Artists' rights are consistent with the purpose behind the copyright laws and the Constitutional provision they implement: "To promote the Progress of Science and useful Arts.".  House Report, at p. 6916 (*emphasis supplied*).

The courts have universally recognized Congress's intent. *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Büchel*, 593 F.3d 38 (1st Cir. 2010) ("Passed in 1990, the Visual Artists Rights Act, 17 U.S.C. § 106A, was an amendment to the Copyright Act that protects the ''moral rights" of certain visual artists in the works they create, consistent with Article 6bis of the Berne Convention (*emphasis supplied*). Citing, *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 133 (1st Cir. 2006); In *Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 83 (2d Cir. 1995), the Second Circuit, citing VARA's legislative history, explained that VARA: protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity", which are analogous to those protected by Article 6 bis of the Berne Convention. *Id*. at 83.

Congress intended that the specific rights granted to authors of a visual works be expansive. Thus, for example, while recognizing that "[s]ome Berne members do not include

14

destruction of a work within the right of integrity because, theoretically, once the work no longer exists, there can be no effect on an artist's honor or reputation … [Congress] provided for the right of attribution and by protecting against both mutilation and destruction." House Report, at p. 6926.

The Court recognized that concealing the Murals behind a permanent wall may qualify as "derogatory action", as it is a statement that the Murals no longer merit a place within the law school community. The Court, however, said that the Berne Convention language, granting the artist the right to object to "any distortion, mutilation or other modification of, *or other derogatory action in relation to,* the said work, which would be prejudicial to his honor or reputation." (emphasis added by the Court), is not applicable because VARA, as enacted, does not include the "other derogatory action" language.

The legislative history demonstrates that the Court's conclusion does not follow. Congress intended to protect the ''moral rights'' of certain visual artists in the works they create, consistent with Article 6bis of the Berne Convention. The "other derogatory action" was added to the Berne Convention language in 1948 to expand the rights of literary authors. [3]

When acceding to the Berne Convention, Congress declined to adhere to the "moral rights" provision, because it concluded that such rights were adequately covered by existing law, including the law of defamation. It is in the defamation field that derogatory statements gain

---

[3] The "or other derogatory action" language was only added in 1948, as explained in the 1948 Conference Report, to enhance the rights of authors of literary works:

> The author will have the right to bring action against any acts prejudicial to his honour [sic] or reputation, and the scale of the discussion revealed that the author has to be protected not only in his capacity as a writer, but also in the role that he plays on the literary stage: it is for that reason that you have added that he could object to any other derogatory action, that being understood to mean any action that would be liable to harm the person through distortion of his work. (1948 Conference Report, at p.260)

importance as they potentially could be the basis for an action. Moreover, derogatory, as defined, is an expression of a low opinion, an insult, or a criticism, communicated either verbally or in a writing.

Congress's omission of the "other derogatory action" language relates to its intention to limit the rights under VARA to works of visual art and, in particular, to exclude written works, as well as preserving the viability of the fair use doctrine[4,] rather than to an intention to narrow the scope of violations that amount to modification and/or destruction of a work of visual art.

When enacting VARA, Congress simply concluded that the "other derogatory action" language was not necessary, as the subject matter of protected works was limited to works of visual art. Thus, while the Court is correct in its conclusion that the concealment of the Murals is a statement that the Murals are offensive and, prejudicial to Kerson's honor of reputation, it does not follow that the omission of the "other derogatory action" language in VARA, limits Kerson's ''moral rights'' in the Murals, consistent with Article 6bis of the Berne Convention.

### D.   Building a Wall to Permanently Block the Murals Is a Violation of VARA

As this Court has already found and Defendant concedes on this Motion for Summary Judgment, the Murals are recognized works of visual art, incorporated or made part of a building in such a way that they cannot be removed without damage, and which Defendant

---

[4] Including "other derogatory action" would have raised First Amendment concerns, in particular, as it applies to the fair use doctrine The fair use doctrine works to balance the ability of authors to control the use of their copyrighted works with the free speech interests of secondary users.  Fair use also enables scholarship and criticism of existing works by allowing authors to use not only the facts and ideas of a work but the expression of that work itself without facing liability for infringement. *See Eldred v. Ashcroft*, 537 U.S. 186, 197, 219 (2003). A rigid protection of an author's work against any "derogatory action" that is damaging to the author's honor or reputation, would undercut the viability of the fair use doctrine. *See, Authors, Attribution, and Integrity: Examining Moral Rights in the United States, A Report of the Register of Copyrights* (2019), at p. 30

intends to intentionally cover with what it calls a permanent wall to forever block the Murals from public view. This intentional blocking of the Murals constitutes an "other modification" of the Murals under VARA.[5]

The issue presented by this case is one of first impression since there is no case in which it is the intent of the art owner to intentionally prevent the art from being viewed as its' expressed motivation in dealing with the art it authorized and controls. Thus, neither *Massachusetts Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010), *Tobin v. Rector, Church Wardens, & Vestrymen of Trinity Church*, 2017 WL 5466705 (S.D.N.Y. Nov. 14, 2017), *aff'd sub nom on other grounds*, 735 F. App'x 32 (2d Cir. 2018), or *English v. BFC&R E. 11th St. LLC,* 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997), *aff'd sub nom on other grounds* 198 F.3d 233 (2d Cir. 1999), offer any guidance under such circumstances.

*MoCA*, concerned a museum's attempt to accommodate an artist by concealing an incomplete work, because he believed that exhibiting the work in that state would be detrimental to his honor and reputation. The temporary tarp failed to fully cover the art as demanded by the artist, which is the inapposite situation presented in the case at bar.

*Tobin* concerned the relocation of a sculpture rather than a concealment.

*English* presents a fact pattern that cannot be equated to the one presented here. In *English* the mural was unauthorized, the building which would block the mural was being constructed by a third party who had no relationship to the art and, thus, could not have entered into any agreement with the artist under 17 U.S.C. §113(d) – and who was legitimately

---

[5] Destruction remains an open issue.

17

developing its property so that blocking of the mural was an unintended byproduct of the use of the property. Moreover, the mural in *English* was on the outside of a building. This important distinction was relied upon in dismissing the VARA claim on public policy grounds. (A "contrary holding would effectively allow building owners to inhibit the development of adjoining parcels of land by simply painting a mural on the side of their building. Such an interpretation of the statute would stretch VARA to its constitutional limits (if not beyond) and raise serious public policy concerns.") Obviously, where the mural is on an internal wall, this public policy concern is inapplicable.

No case has been presented in which the art at issue is being intentionally blocked with the expressed intention to do so to stop the art from being seen. Under these circumstances the two necessary elements of an action under VARA have been sustained – the intentional modification of the Murals and the direct harm to the honor and reputation of Plaintiff with regard to the artwork he created.

Applying the teaching of *Yates* in this action, together with the legislative history of VARA, dictates a finding that Plaintiff's rights are being violated by the wall proposed by VLS. The central purpose of VARA is to protect the attribution and integrity of the visual artist in his/her art and there can be no doubt but that Plaintiff's honor and reputation in the Murals will be damaged by the intentional blocking of his work.

Plaintiff submits that "other modification" includes blocking the Murals and that Congress's failure to include "other derogatory action" did not diminish the applicability of other modification in the context of the statute. As previously argued, the ambiguity of the

word "modification" requires us to look at Congress's intent in enacting the statute and its purpose, as well as the context in which the word is used. The purpose of VARA is clearly to grant visual artists rights analogous to those granted by the Berne Convention and is certainly intended to be expansive in its application to protect the honor and reputation of the artist as provided for in the Berne Convention.

Further the context of the term "modification" in the statute amplifies the intent to include the blocking of the art from public view as evidenced by its use in 17 U.S.C. §106(A). There was no need to provide for the "public presentation exception" if the word modification did not include potential impact on the visual display of the art and not just a physical alteration of it. Add to this the special terms that Congress carved out for art incorporated in a building and the specific limited ways in which it can be removed or destroyed, the intentional covering of the Murals – whether physically touching the wall or not – constitutes an impermissible modification of the artwork.

The failure of Congress to include "other derogatory action" in the statute does not diminish this conclusion. Clearly, as we see both from the Berne Convention Conference notes and the US Copyright Office analysis, that "derogatory" was intended to deal with written works and, raised concerns that  use of the term derogatory would adversely implicate the First Amendment and fair use. There is no basis to speculate that deletion of "derogatory" in VARA intended to narrow the scope of "other modifications".

## IV.    CONCLUSION

Because Plaintiff is unable on the current record to present facts to justify his opposition

19

to the VLS Motion for Summary Judgment, under Rule 56(d), the Court must either defer

considering the motion or deny it or grant Plaintiff time to obtain affidavits or declarations or to

take discovery.

Alternatively, the Court should rule, as a matter of law, that VLS's stated plans to conceal

the Murals, violates Kerson's rights under VARA.


                                                **THE PLAINTIFF,**
                                                **SAMUEL KERSON**


By: /s/ Steven J. Hyman                         By:/s/ Richard I. Rubin

Steven J. Hyman (2097)                          Richard I. Rubin (7012)
McLAUGHLIN & STERN, LLP                         RUBIN, KIDNEY, MYER & VINCENT
260 Madison Avenue                              237 North Main Street, Suite 3
New York, New York 10016                        Barre, Vermont 05641
Phone: (212) 448-1100                           Phone: (802) 479-2514
Fax: (212) 448-0066                             Fax: (802) 479-2516
shyman@mclaughlinstern.com                      rrubin@rkmvlaw.com
*Attorneys for Plaintiff*                       *Attorneys for Plaintiff*


Date:   April 14, 2021