# EXHIBIT A

```
                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF VERMONT


      ---------------------------------------
      SAMUEL KERSON                   )
                                      )
                     Plaintiff,       ) Case No.
                 v.                   )  5:20-cv-202
                                      )
      VERMONT LAW SCHOOL,             )
                     Defendants.      )
      ---------------------------------------


                      DEPOSITION
                         OF
                    EMILY PHILLIPS
          Taken via Zoom on July 29, 2021 at 10:03 AM



      APPEARANCES:

           STEVEN HYMAN, ESQ., McLaughlin & Stern, 260
               Madison Avenue, New York, NY  10016;
           and
           RICHARD RUBIN, ESQ., Rubin Kidney Myer & Vincent,
               237 North Main Street, Suite 3, Barre,
               Vermont; on behalf of the Plaintiff.

           JUSTIN BARNARD, ESQ., Dinse, P.O. Box 988,
               Burlington, Vermont; on behalf of the
               Defendant.



           REPORTER:  Sherri L. Bessery, RMR, CRR


                      PRECISION TRANSCRIPTION, INC.
                       151 Cumberland Road
                      Burlington, Vermont  05408
                       (802) 343-7008
                     depos@together.net
```

## Page 2

INDEX

Witness                                        Page
Emily Phillips --------------------------------- 3
  Examination by Mr. Barnard ------------------ 3
  Examination by Mr. Rubin --------------------- 69
  Re-Examination by Mr. Barnard --------------- 71


Exhibit                          Identified
1 - Notice of Deposition                  16
2 - Declaration                           21

***THIS TRANSCRIPT CONTAINS REQUESTS FOR INFORMATION.
   SEE PAGE 18, LINE 14; PAGE 19, LINE 13.***


          * * *
     IT IS HEREBY STIPULATED AND AGREED BY
AND between counsel that notice of the taking
of the deposition has been given; that
qualifications of the Notary Public shall be
waived and that the witness may be sworn
remotely; and that all objections except as
to the form of the question shall be reserved
to the time of trial.
        * * *

## Page 3

1       EMILY PHILLIPS,
2   having been duly sworn by the Notary
3   Public, testified as follows:
4   EXAMINATION BY MR. BARNARD:
5   Q.    Good morning again.
6         Could you state your full name for the
7   record, please?
8   A.    My full name is Emily Gardner Phillips.
9   Q.    And for purposes of today's deposition,
10  would you prefer Emily or Ms. Phillips?
11  A.    You can go by Emily; I'm okay with it.
12  Q.    Okay.
13        Can you state your business address,
14  please?
15  A.    I am currently located at 10 Elm Street in
16  Essex, New York.
17  Q.    Just across the lake from Vermont.
18  A.    I am; yes.
19  Q.    So have you been deposed before, Emily?
20  A.    No.
21  Q.    Okay.  So let me just give you a couple
22  ground rules to help this go smoothly.
23        It's especially important, given that
24  we're doing this over zoom, if we are talking at
25  the same time it will be very difficult for

## Page 4

1   Sherri to write down a complete and accurate
2   transcript.  So I'd ask that you wait for me to
3   get out questions fully, and sometimes I take my
4   time, before responding so that we're not talking
5   at the same time.
6         If I ask you a question you don't
7   understand, which is sure to happen over the next
8   hour or so, please just ask me for clarification.
9   A.    Okay.
10  Q.    And if you don't ask me for clarification,
11  I'll assume that you understood that.  Is that
12  fair?
13  A.    Yes.
14  Q.    Okay.  You need to give verbal responses;
15  yes, no, or narrative responses.
16        And if you need a break at any time, just
17  say the word and we can take a break.
18  A.    Okay.
19  Q.    Okay?
20  A.    Yep.
21  Q.    Could you just start by describing your
22  educational and professional background generally
23  to me?
24  A.    I believe you've received my CV as part of
25  my declaration.  I entered the field of art

## Page 5

1   conservation approximately 19 years ago; seems
2   wild.
3         Kind of the, the normal track as to work,
4   prior to developing experience, prior to doing a
5   graduate program.
6         I entered into a graduate program at
7   Buffalo State College; one of only a handful in
8   the U.S., that specialize in a Master's degree in
9   Art Conservation, and completed that in 2008.
10        Relocated back to where I am originally
11  from, this area, the Champlain Valley, and
12  established my, my private practice, Phillips Art
13  Conservation Studio.  And have been working as
14  the principal conservator in that role since
15  then.
16  Q.    So I've never had occasion to talk to an
17  art conservationist.  Can you just briefly
18  describe the type of course work that you had to
19  complete for your, your graduate program?
20  A.    Yep.  So we go by conservator.  I know
21  that there's a lot of exchange of that name
22  between law, legal and art world, but anyways.
23        I'm sorry; could you repeat the question
24  again, because I got stuck on art
25  conservationist.

PRECISION TRANSCRITPION, INC.
depos@together.net

Page 6

1    Q.    Sorry; and I will try to be more precise.
2    A.    That's okay.
3    Q.    So can you describe the course work that
4    you have to complete to --
5    A.    Sure.
6    Q.    -- do that?
7    A.    Yeah.  So I mean typically there's
8    several, I mean there's two major tracks of
9    getting into this field.
10        One is the more traditional way of
11   apprentice training; so working under mentors,
12   you know, for a very long period of time, really
13   just in a, in a learning capacity.
14        And then there's this more I guess formal
15   and leaning towards the more accepted version of
16   our training, which is to go through a graduate
17   program.  That involves two years of course work
18   with a third year internship or fellowship, with
19   summer internships interspersed into that.  So
20   both hands-on, mostly hands-on work, but also the
21   course work, at least where I went through the
22   Master's program.
23        They're all, they're all about the same;
24   but you're still just being exposed to all
25   various aspects of art conservation.  So while

Page 7

1    you might be on a track to become a painting
2    conservator, we also learn all of the
3    fundamentals of, you know, paper, manufacturing
4    and paper, basic paper conservation principles,
5    photographs, objects, sculpture, you know, glass
6    basket, archeological epigraphics.  So that we
7    really become more cross-disciplinary and
8    understand when there are projects that come
9    before us we either, you know, know our
10   limitations or we know basic principles of that
11   and how to, and how to deal with, you know, that.
12        I hope that explains kind of the basics of
13   the training process that I went through.
14   Q.    That does.  I have a couple followup
15   questions.
16        But it sounds like what you were just
17   describing is gaining familiarity with the media
18   and materials used in various types of artwork
19   and the means to conserve them; is that fair?
20   A.    Yeah.  I mean, and it involves, I, I like
21   to describe it as a three-legged stool; there's
22   an art historical core to it, there's a
23   scientific analytical core to it, and then there
24   is a studio component to it.
25        So really having those three strengths as,

Page 8

1    as a training conservator are, are really, I
2    mean, basic and, and just the principles of what
3    most of us would be operating under.
4    Q.    You mentioned scientific principles.  Do
5    you as part of your graduate work take lab
6    courses in particular scientific disciplines?
7    A.    Oh, yeah.  I had an engineering track
8    before going into conservation, so I had to go
9    back and take a lot of organic chemistry.  And we
10   are at, at the graduate program, and I think all
11   of them do this now, and some are more heavier
12   than others in science, but really understanding
13   the analytical testing techniques that are
14   available to us; understanding how to, you know,
15   read XRF and, and various testing methods to
16   determine whatever you're, you know, whatever
17   you're seeking out when you're examining or
18   researching artwork of any nature.
19   Q.    Thank you; that's helpful.
20   A.    Yep.
21   Q.    So I believe you said that between the two
22   paths to become an art conservator, the, call it
23   maybe the apprenticeship model and the graduate
24   program model, there is, there is a growing
25   acceptance of the, or predominance of the

Page 9

1    graduate school path; is that correct?
2    A.    I think it's just becoming more expected
3    that most everybody in this generation in the
4    field of conservation will, I don't want to say
5    be required to, but it's just becoming standard
6    practice to have a graduate degree in this field.
7        And there now are even, you know, Ph.D.
8    tracks if you want to specialize in more in depth
9    analytical research of specific artists or
10   aspects of, of the field.
11   Q.    But you do not need a graduate degree to
12   serve as an art conservator?
13   A.    No.
14   Q.    Okay.  Is there any sort of body, either a
15   professional body or a state or national
16   governmental entity, that licenses art
17   conservators?
18   A.    There is not a licensing process, no.
19   Q.    Is there a certification process?
20   A.    No.
21   Q.    Okay.  So someone could go hang out a
22   shingle and call themselves an art conservator
23   and there are no professional regulated standards
24   for practicing in the field; is that fair?
25   A.    Yes.  I would say right now this is

3 (Pages 6 to 9)

Page 10

1   currently a very hot topic in our, in our
2   membership.  I am, there is a professional
3   organization within the United States called the
4   American Institute For Conservation, I am a
5   member of that, I have been since I got into this
6   field 19 years ago.  There is not a -- there was
7   an attempt to have a certification process that
8   was voted down by members several years ago.
9        There is a peer-reviewed status, and I
10  think I included this in my declaration.  It's,
11  you know, a process by which you submit letters
12  of recommendation, support documents from
13  colleagues, and that is reviewed by a body of
14  fellow conservators and they determine, you know,
15  what your competency is as a conservator to then
16  be qualified as a Professional Associate.
17  Q.   Is that under the auspices of any
18  professional organization?
19  A.   That would be under the American Institute
20  For Conservation.  Which is kind of, I mean I
21  don't want to say it's similar to AIA because
22  they do have a certification, licensing process,
23  with architects; but that would be like my, like
24  my professional parent affiliation.
25  Q.   So tell me what sorts of work you do in

Page 11

1   your current art conservation business, what
2   sorts of services you offer.
3   A.   I -- it's, it's wide ranging.  I deal with
4   both private collections, individual projects, to
5   working with the federal contractor system.  I
6   have been in contracts through the National Park
7   Service and the Department of Interior for about
8   five or six years now.  Working with the
9   University Library, it's not just, you know, just
10  specifically painting conservation projects; but
11  if a painting is going to be loaned to another,
12  an institution, I do condition reports looking at
13  the condition of those artworks before they leave
14  and travel and go to another institution.
15       I think I -- it's, it's kind of very
16  broad; yeah.
17  Q.   Okay.  And you mentioned that you're under
18  contract currently to restore a couple of large
19  paintings for the National Park Service; can you
20  tell me about that?
21  A.   This is with Lowell National Historic Site
22  in Lowell, Massachusetts.  The contract is to
23  conserve both paintings and frames by artist John
24  Coggeshall.  They are about 3 to 4 feet by 8 to
25  10 feet in length, and the work it to be done on

Page 12

1   site in Lowell.
2   Q.   Okay.  But these are, these are framed
3   paintings, not murals; correct?
4   A.   I mean, they're large scale paintings,
5   yes.  They're oil on canvas on stretchers in
6   frames, yes.
7   Q.   And what, what sort of conservation work
8   are you doing there?  Has there been damage over
9   time?
10  A.   Yeah; mostly dealing with bad restoration
11  from years past and making them look presentable.
12  Q.   Have you had occasion to restore paintings
13  that have been damaged by water or mold before?
14  A.   Um-hum.
15  Q.   Tell me, tell me a little bit about your
16  experience there.
17  A.   The mold damage, I mean it comes up, you
18  know, on a, on various projects.
19       But specifically one artist's study in
20  Jersey City had flooded, I think the fire
21  sprinkler system had set off, dampening
22  everything in the building.  When I came to the
23  artwork, the mold was, had grown so substantially
24  I actually had thought that the back of the
25  painting might have been the actual painting it

Page 13

1   was so pronounced and I had never seen mold that
2   grow that much.  I guess that's one example of
3   that I think.
4        And then as far as water damage, I think
5   the most, or, or damage to a paint layer from
6   water, couple of things.  One, when I first got
7   into the field I was hired on as a conservation
8   technician for a very large scale mural project
9   in Boston at Trinity Church.  These were a cycle
10  of murals by John LaFarge, done in the Trinity
11  Episcopal Church.  These were both, mostly in
12  caustic, which is wax and pigmented -- pigment in
13  a wax resin applied directly onto a plaster wall.
14       The problem with that building was water
15  was infiltrating through the masonry from the
16  exterior wall and causing the paint then to start
17  detaching from the wall.  So in our conservation
18  terminology, we would call that consolidation; so
19  paint flaking.  You introduce an adhesive; and
20  then by that means you're then consolidating the
21  paint back onto the substrate or the support the
22  painting is carried out on.
23  Q.   And do you know how old the Trinity Church
24  was?
25  A.   I believe 1860, 1870, I believe, maybe

4 (Pages 10 to 13)

Page 14

1  1880; somewhere around there.
2  Q.   So a fairly old building.
3  A.   I guess by art standards, yes.  When I
4  share this with my European colleagues they laugh
5  at how young we really are, you know, just a
6  couple centuries old compared to their four or
7  five hundred year old stuff.
8  Q.   Sure.
9       Just to go back to the mold you were
10  describing in the Jersey City studio.  Can you
11  just walk me through how you address mold damage
12  and what the end product was in that case?
13  A.   So mold is quite complex, in that it
14  really is on pretty much every surface; it just
15  will require a special mix of, you know,
16  moisture, darkness and a little bit of warmth to
17  encourage growth.
18       This mold was quite developed.  This was
19  a, I want to say acrylic or oil on canvas
20  painting.  Everything would have been determined
21  what material the artists were using to construct
22  this; that's, you know, the basis of the first
23  steps in the conservation, as well as documenting
24  all that work.
25       So in that case, using, also the safety of

Page 15

1  myself, wearing a HEPA respirator; I think I
2  might even been wearing a full Tyvex suit and
3  gloves.  Mechanically removing the mold from the
4  surface using a HEPA filtration vacuum; and then
5  going back in and applying an alcohol, ethanol
6  with water solution to inhibit the growth of mold
7  again.
8       I mean, once it's sort of grown, it's
9  really hard to get it to not want to come back.
10  And so the only real steps that you have after
11  that is to continue with visually monitoring the
12  artwork and keeping it in a controlled
13  environment at that point in order to make going
14  forward recommendations.
15  Q.   Okay.  So there's an ongoing risk of
16  reoccurrence that were you able in that case to
17  more or less fully remediate the mold damage to
18  the works?
19  A.   I wouldn't say -- I mean, fully remediate
20  to the point that it was visually not, you know,
21  there was no signs, signs of any more bloom or
22  any more growth of the mold.  It's been a few
23  years; I might want to, I might check that, so
24  yeah.
25  Q.   Okay.  But at the time to an observer, it

Page 16

1  would look more or less as it did before the mold
2  set in; is that fair to say?
3  A.   No.  Actually the mold caused quite a lot
4  of damage in that it, it really worked itself
5  into the surface of the paint layer, and so there
6  was a shift in the visual appearance of the
7  artwork.  The mold caused some staining; and that
8  was not something that I, that was, was
9  reversible, no.
10  Q.   Okay.  Have you previously been hired to
11  serve as an expert in any legal cases?
12  A.   No.
13  Q.   So I want to have you look at what I've
14  sent to you and what will be marked Deposition
15  Exhibit 1.
16  A.   Um-hum.
17  Q.   It's a Notice of Deposition that we sent
18  to the attorneys for Sam Kerson.  Have you
19  reviewed this document?
20  A.   Yes, I have.
21  Q.   Okay.  The Notice of Deposition contains
22  certain document requests, and I just want to run
23  through these with you quickly to confirm that no
24  responsive documents exist.  I understand from
25  Mr. Kerson's attorneys that there were no further

Page 17

1  documents to provide; but we'll just run through
2  and verify that.
3  A.   Sure.
4  Q.   So we asked, number 1, for your complete
5  file pertaining to work conducted by you in this
6  matter.
7       Can you explain what, if any, documents
8  you maintain concerning your work for Mr. Kerson?
9  A.   The file, I guess the documents, would
10  have been the, I think the list of documents that
11  were sent to me, the Hecht Declaration; all of
12  the documents that would have provided me some
13  content into the, into the matter so that I could
14  look at it, I can't think of all the people that
15  were interviewed, but all of the, all of the
16  documentation as well, yeah.
17  Q.   So the filings with the court.
18  A.   Yes; thank you.
19  Q.   Did -- have you created any notes or
20  internal memos in the course of conducting your
21  work?
22  A.   No.
23  Q.   Okay.  And you haven't drafted, other than
24  your affidavit, which we'll get to, you haven't
25  drafted a report; correct?

PRECISION TRANSCRITPION, INC.
depos@together.net

Page 18

1  A.   Correct.
2  Q.   Okay.  Have you received any e-mails from
3  Mr. Kerson's attorneys in which they have
4  described any of the background facts of the
5  case?
6  A.   Like their own personal statements or --
7  Q.   Any e-mails in which, or letters, in which
8  they provided you facts for consideration or for
9  background.
10  A.   I would say yes.
11  Q.   Okay.
12  A.   If that would be included with what we
13  were talking about, the legal documents, sure.
14  Q.   Okay.  After the deposition's complete, I
15  will want to have you look back through your
16  e-mails; and if there are e-mails in which you
17  have been provided facts by Mr. Kerson's
18  attorneys, we would ask that you provide them to
19  Mr. Kerson's attorneys to turn over to us.
20  A.   Okay.
21       MR. RUBIN:  Justin, we don't have a
22  problem with that.  To the extent we
23  provided background and factual information,
24  we'll provide it to you.
25       MR. BARNARD:  Thank you.

Page 19

1       MR. RUBIN:  As opposed to conversations
2  or colloquies about the work or work
3  product.  But direct factual information, no
4  problem.
5       MR. BARNARD:  Okay.
6  Q.   Have you reviewed any third party
7  publications or reports or textbooks in your work
8  in this matter?
9  A.   No; no.
10       I think the, the only thing that I may
11  have reference to was just for the content of the
12  Oddy test results was like an online Wiki that we
13  use for, you know, this type of research.  And I
14  can provide you with that website and link.
15  Q.   Sure.  Do you have it handy, or do you
16  want to send it through Mr. Kerson's attorneys
17  after the deposition?
18  A.   I can send it to Steve and Rich.
19  Q.   That's fine.
20       And lastly, number 10 in our deposition
21  notice, any invoices, bills and statements of
22  service for your work in this litigation, or
23  e-mails related to compensation.
24  A.   No.
25  Q.   Okay.  Now I understand that you are not

Page 20

1  charging Sam Kerson for your time on this case?
2  A.   Correct.
3  Q.   Okay.  And you are charging Vermont Law
4  School for your time today; correct?
5  A.   I believe that was the arrangement of the
6  deposition, but yes; correct.
7  Q.   Yeah, okay.  And what's your rate?
8  A.   150 an hour.
9  Q.   Tell me why you are working on this case
10  for Mr. Kerson for free.
11  A.   I, I, I'm not -- I don't know really how
12  to answer that.
13  Q.   Is it because you believe in his cause?
14  A.   I think it, it's, it's, you know, belief
15  in having a professional provide some content
16  and, and look at this from a conservation/
17  preservation point of view, yeah; sure.
18  Q.   Let me put this a different way.  If, if
19  we were talking about a large scale mural
20  celebrating the confederacy and there was a
21  proposal to cover it, would you be inclined to
22  offer your services for free in that case?
23  A.   Oh, sure.  I mean, I, I -- the content of
24  the artwork is not relevant to me as a
25  professional.  We are really trained right off

Page 21

1  the bat that that is not part of the
2  precipitating reason why we are in this field; so
3  I would be doing this regardless of the content.
4       It was reached out by, from a colleague of
5  mine to consider providing my opinions on this.
6  We have, as you I'm sure are aware in the legal
7  world, you know, I don't, I don't want to say a,
8  to do things pro bono always, but I mean when
9  they, when the opportunity arises to provide
10  professional guidance and support and there is
11  the inability to compensate, I, I will do that.
12  I think we are, we are all rooted in that as
13  professionals in this field.
14  Q.   Okay.  So your decision to do this work
15  for free had nothing to do with your views on the
16  merits of the artwork?
17  A.   No.
18  Q.   Okay.  So I would have you, if you don't
19  have it out before you, just look at what I've
20  been, I've provided as Deposition Exhibit 2,
21  which is a Declaration that was signed by you and
22  submitted in this case.  Do you have that in
23  front of you?
24  A.   Yep.
25  Q.   Okay.  Does this Declaration fully

PRECISION TRANSCRITPION, INC.
depos@together.net

Page 22

1  describe your opinions at this time?
2  A.   Yep; yes.  At this time, yes.
3  Q.   You've had no occasion to develop further
4  opinions on the proposal to cover Mr. Kerson's
5  mural since you signed this affidavit?
6  A.   No.
7  Q.   Now your affidavit described factors that
8  need to be considered in determining whether the
9  proposed wall complies with recognized art
10 conservation practices; is that fair?
11 A.   Yes.
12 Q.   So your opinion in this case addresses the
13 issue of whether the proposal to cover the mural
14 will comply with recognized art conservation
15 practices; correct?
16 A.   Yeah.  I don't -- I'm stuck on the word
17 comply.  Sure; yeah.
18 Q.   How would you put it?
19 A.   I think, no, comply is a good word.
20 Q.   How about will comport with --
21 A.   Sure.
22 Q.   -- good practices --
23 A.   Yes.
24 Q.   -- in the art conservation field?
25 A.   Yes.

Page 23

1  Q.   What materials, other than the filings in
2  this case, did you review in preparing your
3  opinion?  You referenced a Wiki on the Oddy test.
4  A.   Um-hum.
5  Q.   Were there any other materials you looked
6  at?
7  A.   Any other materials that I looked?  Can
8  you just repeat that again?  Sorry.
9  Q.   Sure.  What materials did you review in
10 preparing this affidavit and your opinions in
11 this matter?
12 A.   Materials pertaining to the construction
13 of the artwork and the proposed materials to be
14 used to cover that, or -- is that what you're --
15 Q.   I just want to know what, what you
16 considered.  You described -- let me put it this
17 way.  You've described having looked at various
18 filings that have been made in this legal case.
19 A.   Yes.
20 Q.   At a Wiki page on the Oddy test protocols.
21 Was there anything else, any other documents or
22 materials that you consulted in forming your
23 opinions?
24 A.   No.  I mean, other than I think the
25 conversation that I had with Mr. Kerson about

Page 24

1  his, you know, artist's working methods and
2  materials, no.
3  Q.   Did you talk to Mr. Kerson on multiple
4  occasions or just once?
5  A.   Just once.
6  Q.   Okay.  And what do you recall discussing
7  with him?
8  A.   Specifically about the materials that he
9  used to construct this mural; how he layers, you
10 know, the type of paints that he's using, how
11 he's working, you know, with a brush, what his
12 intention is as an artist, with the life of his
13 artwork, the type of surface that he is working
14 to achieve.  Some artists like a very mat, flat
15 surface, some like very shiny surfaces; very
16 specific I guess nuances or preferences each
17 artist has.  Just basically that context for me
18 to understand how the Vermont Law School mural
19 was constructed.
20 Q.   Tell me what you recall about the
21 materials he used in constructing the mural.
22 A.   Pretty simple.  I mean, he was using
23 custom-made, working with paint company call
24 Guerra, I think that's been mentioned; they're
25 out of New York City.

Page 25

1       He is painting directly onto a prepared
2  drywall support.  I think it's, you know, very
3  standard construction of a mural of this type.
4  That's about all that I gathered from that.
5  Q.   Okay.  You referenced a finish of the
6  work?
7  A.   Um-hum.
8  Q.   What do you recall about the finish he was
9  trying to achieve?
10 A.   I, from what I recall, I think the surface
11 has a slight sheen to it.  I wouldn't call it
12 overly shiny.  You know, the colors that he uses
13 are very, are very vibrant, very bright.  I'm not
14 sure what the specific pigments, you know, are
15 that he's using.  But, you know.
16 Q.   In your affidavit it says you conducted
17 related research relevant to the circumstances
18 presented here.  Can you tell me what research
19 you conducted?
20 A.   In relationship to this, to this mural?
21 Q.   Yes.
22 A.   I think just what I have shared; just
23 discussing with him an understanding of the type
24 of paints that he's using.
25      We also do that so we understand, if there

7 (Pages 22 to 25)

Page 26

```
 1    were to be any future conservation, you know,
 2    materials that we choose as a conservator ought
 3    not to affect or impact the artist's original.
 4    So acrylics are really sensitive to a whole range
 5    of solvents and other solutions that I would just
 6    have to rule out using them; if, if this was like
 7    a conservation project, you know, if I was
 8    looking at this from a, you know, surface
 9    cleaning and that kind of thing.  And I think the
10    other, I think that would be the other research.
11         And then just as far as this acoustic tile
12    component, it was an unknown to me; and so I,
13    looking into that a little bit more as to what
14    that was being proposed to use to cover over the
15    mural.
16    Q.    And is the reason you inquired about the
17    materials and finish that the vulnerability of a
18    work to environmental damage will depend in part
19    upon the materials that are used?
20    A.    Oh, sure; absolutely.  It's all -- yes.
21    Q.    Okay.  And is there anything about the way
22    in which this mural was painted and finished that
23    makes it particularly vulnerable to environmental
24    damage or --
25    A.    I, one major red flag for me immediately
```

Page 27

```
 1    is that these are painted on exterior walls.  By
 2    that nature you're incurring the possibility of a
 3    lot of different shifts in temperature, humidity,
 4    moisture infiltration into that wall from, I mean
 5    because we have very cold, you know, winters and
 6    very hot, humid summers, and exterior walls can
 7    cause all sorts of factors to be, to present
 8    themselves.
 9    Q.    Sure.  And I, we'll get into that a little
10    bit as we go along.
11         But as to the materials themselves, are
12    the paint and the method used fairly standard for
13    murals?
14    A.    Yes, I would say they are.
15    Q.    So there's nothing about the materials
16    used that makes them particularly vulnerable to
17    environmental damage here; correct?
18    A.    I don't think so, no.
19    Q.    Okay.  Can you describe your understanding
20    of what the plan is for covering the mural?
21    A.    It's my understanding that the proposal is
22    to mount around the perimeter of the painting 1x4
23    pieces of wood frame at the, the mural; and then
24    adding vertical members onto that that then these
25    acoustic, Acoustimac panels then would be
```

Page 28

```
 1    attached and mounted to.
 2    Q.    You are not giving an opinion here that
 3    the actual installation of the cover will harm
 4    the mural; correct?
 5         MR. RUBIN:  Objection.
 6    A.    I mean, it --
 7         MR. RUBIN:  I'm not sure the question
 8    is technically correct.  Objection.  Go
 9    ahead.
10    Q.    Do you have an opinion as to whether the
11    installation of the cover, as opposed to the
12    long-term risks posed by the cover, will have an
13    impact on the mural?
14    A.    You're saying like the actual application
15    of the, of this?
16    Q.    Correct.
17    A.    Versus it being applied and then what it
18    would look like long term?
19    Q.    Yes.
20    A.    I mean, any time I think you have, you
21    have any construction going on in front of a
22    artwork there is, there is the opportunity for
23    risk and damage, sure; I wouldn't rule it out.
24    Q.    There is an opportunity for risk or
25    damage; but is it your opinion that it is more
```

Page 29

```
 1    likely than not that merely installing this cover
 2    will harm the mural?
 3    A.    I can't speak to that; I, I haven't --
 4    Q.    You cannot offer an opinion that it is
 5    more likely than not that there will be immediate
 6    harm to the work because of installation of the
 7    cover?
 8    A.    I don't think I can speak to what, you
 9    know, the contractor or whomever would be doing
10    the work.  That would be I would say an opinion
11    on their capabilities; and I, I wouldn't want to
12    have an opinion on that.
13    Q.    Okay.  So just to be absolutely clear; you
14    are not offering an opinion on that issue, on
15    whether the installation of the cover itself will
16    in fact immediately cause harm to the mural?
17    A.    If, if you're asking for certainty, I
18    cannot provide that.  I would say it would just
19    be an assumed potential greater risk for it.
20    Q.    Okay.  But do you have any reason to
21    believe that risk arises to a level that is
22    greater than 50 percent?
23    A.    Oh, I, I don't; I can't make that
24    assumption, no.
25    Q.    Okay.  So you are not offering an opinion
```

8 (Pages 26 to 29)

Page 30

1    that it is more likely than not that installing
2    the cover will --
3    A.    I guess I will not offer an opinion on
4    that, no.
5    Q.    Thank you.  So your opinion is that the
6    proposed covering does not comport with best
7    practices in the art conservation field; is that
8    fair?
9    A.    I would say that's a fair, a fair
10   representation of that, yes.
11   Q.    I want to walk through the reasons you
12   give in your affidavit why that's so.
13          And start with the acoustic tiles.  You
14   raise a concern that the acoustic tiles have not
15   been tested under the Oddy test protocols.  Can
16   you explain what those are?
17   A.    I think I just generally stated that the
18   acoustic panels are not a material familiar to
19   the use in our field when it comes to being in
20   close contact to an artwork.
21          So Oddy tests are one analytical tool in
22   determining whether or not a material could have
23   some detrimental effect on an artwork.  We do
24   this with, you know, everything; paints, fabric,
25   any, any type of construction material.  This is

Page 31

1    -- yes, so I said that.
2    Q.    I understand that's the end goal of the
3    Oddy test.  I want to understand more what is
4    involved.  You break down a material and subject
5    it to chemical testing?
6    A.    In this case, the Oddy test is a test by
7    which you could either pull out individual
8    components of this, say, acoustic tile, or look
9    at it as its entirety.  You, by using metal
10   coupons made of copper, lead and silver, you
11   place that material into a container, seal it,
12   you have a controlled, a control, which is same
13   metal coupons without anything in it.
14          You basically set it, you know, on the
15   counter and then let 30 days, approximately, go
16   by; and then if there's any effect shown on the
17   metal coupons, then it would suggest that there
18   are off-gassing or some sort of material that's
19   either degrading or part of the construction of
20   that material that is negatively impacting those
21   metal coupons.
22          So for instance, and I, and I hope I don't
23   get this messed up, but like say if the copper
24   starts to discolor, or tarnish, sorry, it could
25   be considered that there's sulphur off-gassing

Page 32

1    out of that material.  So there's a whole
2    database of existing materials that have been
3    tested.  And when they start to show you,
4    exhibit that type of result, we would, we would
5    seriously consider whether or not that could then
6    cause any further damage to the artwork that it
7    would be in close proximity to.
8    Q.    And is there a -- when you identify a
9    risk, when there is a change to the metal coupons
10   that are enclosed with the materials, is there a
11   further step where you analyze the particular
12   gasses that have been generated?  Or is it just a
13   flag for a potential concern?
14   A.    I think it's, you know, you could do both;
15   you could look at it at both.  But I mean, I
16   think there's certainly, this is certainly just
17   one, one type of testing technique that's
18   available.  I think this is kind of the baseline
19   that you start with.  And if, you know, you want
20   to continue down further exploring the specifics
21   of why that material is presenting these test
22   results, I think those options would be available
23   to you.
24   Q.    Is the Oddy test something that you
25   conduct yourself, or would you send it off to a

Page 33

1    specialist?
2    A.    No, they're really made to be pretty
3    available for most conservators; there's not any
4    really special equipment that would be used.  So
5    it's, it's really made to be available for most
6    any colleague practicing, whether they're in an
7    institution or in private practice; it's not
8    prohibitive.
9    Q.    So your concern with the acoustic tiles
10   here is that they have not been subjected to any
11   sort of testing so you do not have information on
12   how they might affect the mural; is that fair?
13   A.    Yep; yes.
14   Q.    You haven't yourself obtained one of these
15   tiles and tested it; correct?
16   A.    No.
17   Q.    You also raise a concern with permeability
18   of the tiles.  Can you explain the concern there?
19   A.    The permeability in what respect?
20   Q.    Let me read from your Declaration.
21   A.    Yep.
22   Q.    Nor can I determine the permeability of
23   the panels and how they will allow for proper
24   airflow.
25          MR. RUBIN:  What paragraph, Justin,

PRECISION TRANSCRITPION, INC.
depos@together.net

Page 34

```
 1      please?
 2          MR. BARNARD:  Paragraph 10.
 3      A.   I think that this just speaks to what not,
 4   you know, not knowing this material, not knowing
 5   this in the context of, you know, an art
 6   conservation exhibits in the context of the use
 7   of it in close proximity to the artwork.
 8          And also just by, you know, the, the
 9   entire system, if you're looking at this, of
10   applying this with that tight of an air space
11   onto a mural that's then onto an exterior wall,
12   that the system of that is, concerning.  I
13   think that that's probably what I was speaking
14   to; is whether or not, you know, you're -- it's
15   my understanding that the, this acoustic tile
16   contains a mineral wool or a rock wool type of
17   material.  It's, it's made to be used in the
18   respect of mounting to a wall to reduce noise and
19   vibration.  And this, now you're asking to cover
20   over a mural with a very small air space on an
21   exterior wall, and there is concern about that
22   airflow.
23          I mean, this is an insulating material;
24   and so there is concern whether or not the
25   construction of that panel would prohibit and
```

Page 35

```
 1   allow for proper airflow, I think is just what I
 2   was speaking to.
 3      Q.   Thank you.
 4      A.   Yeah.
 5      Q.   The concern is that this is an unknown;
 6   correct?
 7      A.   Yes.
 8      Q.   And in your opinion, using an unknown
 9   material is not consistent with best art
10   conservation practices; correct?
11      A.   Correct; yes.
12      Q.   But given that this is an unknown, you
13   cannot offer an opinion that the acoustic tiles
14   will in fact lead to harm to the murals; correct?
15          MR. RUBIN:  Objection.  You can isolate
16   each individual --
17          MR. BARNARD:  You've made your
18   objection.  No speaking objections, please.
19      Q.   Please proceed.
20      A.   I'm sorry; could you repeat what --
21      Q.   Sure.
22          Because this is an unknown, you are not
23   able to offer an opinion that the acoustic tiles
24   will in fact cause harm to the mural; correct?
25      A.   I would speak to say that's not entirely
```

Page 36

```
 1   true.  Through my research of the Oddy test
 2   results, there are components of this acoustic
 3   tile, and again I don't know because these
 4   aren't, you know, the Acoustimac company wouldn't
 5   divulge or provide or propriety or whatever, I
 6   don't know the actual context of it, but if you
 7   were to take and say mineral wool, rock wool,
 8   whatever it is, there are -- those, those, that
 9   material had been specifically tested and failed
10   the Oddy test.
11          So if I were to just base it on that, and
12   then this construction of this laminated wood
13   called plywood support that this on, and the
14   amount of glue or adhesive that was used in the
15   construction of that, I could assume that it, it
16   would be more likely to cause damage than not, if
17   that's answering your question.
18      Q.   So you don't -- you haven't actually
19   examined these tiles yourself; correct?
20      A.   Right.
21      Q.   And you testified that their makeup and
22   their likelihood of harming, of creating a
23   harmful environment is not known; correct?
24      A.   I'm sorry; say that again.
25      Q.   You testified that the -- you do not know
```

Page 37

```
 1   how these acoustic tiles will behave in that
 2   environment; correct?
 3      A.   I don't --
 4          MR. RUBIN:  I'm going to object to the
 5   question.
 6          MR. BARNARD:  Sure.
 7      Q.   You can answer.
 8      A.   I, I don't -- I guess the way that you're
 9   phrasing it, sorry.
10      Q.   Sure, let me.
11          Can you say that you have a basis to offer
12   an opinion on how the acoustic tiles will behave
13   in this environment?
14      A.   I think what, your focus is on just the
15   acoustic tile and not the entire system of which
16   is being presented, which is the bigger picture
17   of setting up a painting on an exterior wall with
18   a very limited air space with an unknown, in my
19   world of art conservation, material that then
20   you're applying onto the face of this painting,
21   for an undetermined amount of time.
22      Q.   Okay.  But it is an unknown material;
23   correct?
24      A.   I guess, yes, as a, as a whole, this
25   Acoustimac acoustic tile is not something that
```

PRECISION TRANSCRITPION, INC.
depos@together.net

Page 38

1   has, we, we would, I, I can find and, you know,
2   and I would use in this.
3   Q.   So you do not have any specific
4   information on how the acoustic tile will
5   function in that environment; correct?
6        MR. RUBIN: Objection.
7   A.   Specifically --
8   Q.   Go ahead, please.
9        MR. RUBIN: Let me just say, it's not a
10       speaking objection, I just, she, she can
11       answer the -- Emily, you can answer the
12       question when I object; so don't, don't be
13       distracted by that.
14       THE WITNESS: Oh, okay.
15   A.   No, I just, I guess I'm just speaking to
16   the construction and the components of this are
17   concerning when you look at it from how this is
18   constructed and not knowing that this is a
19   material that has ever been proposed to cover
20   over a painting or an artwork of this, you know,
21   yeah.
22   Q.   So is it fair to say that the concern here
23   is because it is unknown, there is risk?
24   A.   The concern for what?
25       MR. RUBIN: Excuse me; objection.

Page 39

1   Q.   Is your concern from an art conservation
2   perspective that this is an unknown and you
3   cannot know how it will affect the mural?
4   A.   I think it's one component of an overall
5   concern that this painting, again, is constructed
6   on an exterior wall, that you're proposing to
7   have a very small air space that then this
8   acoustic panel is going to be applied to; that
9   entire system is very concerning to me.
10   Q.   Okay.  It is a risk, but it is a risk
11   because of the unknown materials; is that fair?
12       MR. RUBIN: Objection.
13   A.   It's a risk of what?
14   Q.   Let me, let me back up.
15   A.   Okay.
16   Q.   I believe you testified that using an
17   unknown material like the acoustic tiles is not
18   consistent with best art preservation practices;
19   correct?
20   A.   Well in this instance they, they've
21   proposed to use this acoustic tile, and that is
22   not something that I am aware is a material that
23   would be used in, in this context.
24   Q.   Okay.  You do not have a --
25   A.   And it is concerning, yes.

Page 40

1   Q.   You do not have a body of evidence on how
2   these acoustic tiles function in close proximity
3   to an artwork; correct?
4   A.   I mean, other than what, what this
5   proposal is, yeah; no.
6   Q.   Okay.  So just focusing on the acoustic
7   tiles alone, I understand, we will get to the
8   fact that this is painted on an exterior wall,
9   but just focused on the use of the acoustic
10   tiles, are you offering an opinion that it is
11   more likely than not that the acoustic tiles will
12   in fact cause harm to the mural?
13   A.   Well I think I stated it in my
14   declaration; it may adversely impact the murals.
15   Q.   And you say may.  Can you say, not knowing
16   the actual performance of these materials, that
17   it is more likely than not that there will be
18   harm to the mural?
19   A.   I mean, I, I see where -- I, I understand
20   where you want me to take a position on this.
21   And again, I'm just speaking to the fact that
22   this is a material that is unfamiliar in this
23   context to me.  I cannot speak to any certainty;
24   only, you know, the concern that this is not
25   something that I, I have any familiarity with in

Page 41

1   this context of being used to cover over an
2   artwork for an undetermined, long-term time
3   period.
4   Q.   And in --
5   A.   In the context of the entire system,
6   again, like looking at this from the entirety of
7   it and not just this panel, but the entire system
8   of which is being proposed, so.
9   Q.   Thank you.  And I apologize for
10   interrupting.
11   A.   That's okay.
12   Q.   I, Emily, I'm not asking you to take a
13   position.
14   A.   Okay.
15   Q.   What I, all that I'm trying to do is to
16   get you to clarify what I think you just did, but
17   let me take another try at it.
18       You are not offering an opinion that to a
19   specific degree of certainty there will be harm
20   to the mural because these acoustic tiles are
21   being used; correct?
22       MR. RUBIN: Objection.
23   A.   I think any time you introduce an unknown,
24   you are setting yourself up for the possibility
25   of possible, you know, damage to the painting.

11 (Pages 38 to 41)

Page 42

1    I mean, you're, you're applying an unknown
2 material onto, in front of, in very close
3 proximity to an artwork for an undetermined
4 amount of time; and there, and there's concern
5 there that there's no idea, no, no context of
6 this being used or being acceptable material in I
7 guess the art world, art conservation world,
8 museum environment world.
9 Q.    Okay.  So you've made very clear that your
10 opinion is that this is not, in your opinion,
11 consistent with best practices in art
12 conservation; correct?
13 A.    The use of this acoustic tile?
14 Q.    Correct.
15 A.    I would just say in general the use of an
16 unknown material, without that type of
17 consideration of the impact it would have on an
18 artwork, is not best practices.
19 Q.    Okay.  I, and I'm going to ask this again
20 to try to just get a simple answer.
21    You are not offering an opinion as an art
22 conservator that there -- it is greater than 50
23 percent probable that the use of these acoustic
24 tiles, which are an unknown, will in fact cause
25 harm to the mural; yes?

Page 43

1    MR. RUBIN:  Objection.  The question is
2 -- does not in any way reflect the context
3 of the totality of her opinion.
4    MR. BARNARD:  Okay.  And no speaking
5 objections, please.  If we have any more,
6 we're going to stop the --
7    MR. RUBIN:  And I'll also object
8 because you've asked and answered -- you've
9 asked that question six times and she's
10 answered it.
11    MR. BARNARD:  I have not gotten a
12 straight answer.
13    MR. RUBIN:  You haven't got the answer
14 you want, but you've gotten an answer.
15    MR. BARNARD:  Please stop.  I'm
16 entitled to continue -- if you want to stop
17 the deposition, you can, and you can seek an
18 order.  But short of that, please refrain
19 from making speaking objections.
20    I am simply asking to clarify the scope
21 of her opinions.  And I -- it is relevant
22 whether she is offering an opinion that is
23 more likely than not that the use of these
24 unknown tiles will in fact cause harm to the
25 murals.  I understand --

Page 44

1    MR. RUBIN:  You're speaking now.  Why
2 don't you just ask your questions of her.
3    MR. BARNARD:  Yeah.
4 Q.    Let me try once more.
5    Are you offering an opinion that it is
6 more likely than not that the use of these
7 unknown materials will in fact cause harm to the
8 mural?
9    MR. RUBIN:  Objection.
10 A.    Again, because of the unknownness of them,
11 I can only assume, based on what I understand is
12 the construction of it, and again, because
13 they're not a material that has been -- is used
14 in this context, and I mean, again, I mean I hate
15 to keep saying this as, as the entire system of,
16 of what is being proposed, I, I can't see how it
17 wouldn't cause damage.  I mean, I just -- you
18 know, you're --
19 Q.    These are unknown materials; correct?
20 A.    Right; yes.
21 Q.    They have not been subjected --
22 A.    Well unknown in, in this, in this context.
23 I'm sorry to interrupt; but I just want to
24 clarify that these are unknown materials.  An
25 acoustic panel is not something to me, I mean,

Page 45

1 that I have ever seen used in close proximity to
2 cover up an artwork, a painting, a mural,
3 whatever you want to call it, and it's
4 concerning.
5    I don't know how else you want me to say,
6 how else I can answer this in a way that reflects
7 what I have been presented with, the proposal
8 that's been provided to me from Vermont Law
9 School to cover up this mural.  And, and one of
10 the concerns was this acoustic panel, red flag
11 immediately that this is not something that, that
12 has -- I have ever seen used in this context,
13 nor, you know, in the context of close proximity
14 to artwork.
15    And I mean, as I said, going through the
16 Oddy test results individually, there are
17 suggestions, there are tests that have been
18 conducted on similar types of material, the rock
19 wool, the mineral wool, that have shown concern
20 and failed in those tests to be acceptable
21 materials to be utilized in proximity to artwork.
22    That's, so by that, by deducing from that,
23 I would say, and I don't know what percentage, I
24 don't work in percentages, I would say it's more
25 likely than not that this acoustic panel in the

12 (Pages 42 to 45)

Page 46

1  creation of this entire system, with a very
2  limited air space and with this painting being on
3  an exterior wall, is cause for concern, and I
4  can't see how damage couldn't occur over time.
5  Q.   When will that damage occur?
6  A.   I mean, I don't know.  I mean, I hope --
7  I, I, I don't know; I can't answer that.
8  Q.   You don't have any basis to predict when
9  it will occur?
10  A.   I, I wouldn't want to even speculate.
11  Q.   It would be speculation in fact; correct?
12      MR. RUBIN:  Objection.
13  A.   No.  I mean, you could make assumptions.
14  I mean, you know what the typical, you know,
15  climate cycle is here; unless we continue on with
16  these, you know, hot, very unusual summers and
17  the amount of rain we're having.  But any time
18  you have a typical New England weather cycle, you
19  have the ability for these rapidly changing
20  shifts in temperature and humidity.
21      I don't know how long it would take
22  before, you know, air gets trapped and moisture
23  becomes a problem and you end up, you know, with
24  damage to the, to the paint surface of the mural.
25  I, you know, I --

Page 47

1  Q.   Well let's talk about that.  You say you
2  don't see how damage could not occur.  What is
3  the damage that occurs?
4  A.   The potential damage that could occur?
5  Q.   Well you've said it's more likely than not
6  that damage will occur.
7  A.   I mean, I think we're talking about, you
8  know, what, what the main possibilities are; and
9  that's mold or, you know, fungal growth due to
10  high levels of moisture and humidity,
11  temperature.  You're talking about delamination
12  of the paint; you're talking about possible
13  shifting of pigments, colors.  I mean, there's
14  certain pigments that, you know, respond
15  differently to different types of conditions.  I
16  think that could change color or surface quality
17  over time.  There's a, there's a bunch of
18  different factors there.
19  Q.   That relates to the flow of air in that
20  space and the climate conditions; correct?
21  A.   That's one, one component, yes.  And then,
22  and then again, whatever components are in that
23  acoustic tile that could then off-gas and become
24  trapped in this, in this area for sure.
25  Q.   When would that damage occur?

Page 48

1  A.   I don't know.
2  Q.   And what specific damage could occur from
3  this off-gassing?
4  A.   I, I wouldn't be able to say because I
5  don't know, you know, the, what off-gassing of
6  this material would be.  That would -- I can't.
7  Q.   And again, you have not -- you don't know
8  what the permeability of these acoustic tiles is;
9  correct?
10  A.   Like the permanence of them?
11  Q.   The permeability.
12  A.   I guess that's the unknown, correct?  I
13  mean --
14  Q.   So you don't know what gasses would be
15  off-gassed, if any, you don't know how permeable
16  the tiles are, you don't know when damage will
17  occur, but you can offer an opinion that it is
18  more likely than not that damage will in fact
19  occur from this unknown material?
20      MR. RUBIN:  Objection.
21  Q.   I'm trying to -- I understand that your
22  opinion is that these are not consistent with
23  best practices and that there is risk.  I'm
24  trying to understand how you can offer an opinion
25  quantifying that risk as more likely than not to

Page 49

1  cause actual harm to the mural.
2  A.   Well I --
3      MR. RUBIN:  Objection.  Excuse me;
4      objection, that's not a question, that's a
5      statement.
6  Q.   Please explain to me, please explain to
7  me, given the unknowns that we've just discussed
8  that you don't know what gasses will be off-
9  gassed, you don't know how permeable the tiles
10  are, and thus don't know how they will regulate
11  airflow to the material, how you can offer an
12  opinion that it is more likely than not that use
13  of these tiles will cause damage to the mural?
14      MR. RUBIN:  Objection to the form.
15  A.   Again, you're, you're, you're not looking
16  at the entire picture of this, and this is what I
17  was asked to do, was to look at the entire
18  proposal of which this mural was going to be
19  covered over and the, and the construction of it.
20      And so when you, again, are taking a
21  painting that's on an exterior wall and you're,
22  you have a very limited air space and you're
23  applying an unknown material onto the face of
24  that, there is cause for concern that that, that
25  whole system has the potential to damage a

13 (Pages 46 to 49)

Page 50

```
 1   painting.
 2        And it, again, I, I don't know how else to
 3   say this, is that the acoustic tile is not
 4   something that I have seen or encountered in the
 5   use in this respect in this context in close
 6   proximity to an artwork.  I guess that's all,
 7   that's all, all I can say.
 8        And as far as the other stuff, I mean,
 9   again, that, that was not part of my, you know,
10   what I was asked to look at.  I was asked to look
11   at what the proposed wall construction was and,
12   and the concerns that I had in relationship to
13   the long -- to the, to the protection of this
14   mural.
15   Q.    You were asked to consider as an art
16   conservator whether this proposed covering was
17   consistent with best practices?
18        MR. RUBIN:  Objection.
19   A.    Yes.  I, I, I guess that would be, that
20   would be my role in this.
21   Q.    Okay.  So we may come back to this; but I
22   want to move on to the portion of your
23   Declaration that relates to the space between the
24   wall and the mural.
25        You've said multiple times that you're
```

Page 51

```
 1   concerned about the fact that the mural is
 2   painted on an exterior wall.  Can you explain
 3   why?
 4   A.    I think I already did, but I will go
 5   through it again.
 6        Exterior walls are, just by the nature of
 7   them, problematic.  They're a point where major
 8   shifts as we know in New England of temperature
 9   and humidity can occur.  There is a potential for
10   moisture to infiltrate from the exterior into the
11   wall.  I mean, it's just, it, they're just, by
12   the nature of them, a concern I, I guess.
13   Q.    That risk will vary based upon the manner
14   of construction and insulation; correct?
15   A.    Sure.
16   Q.    If you have a well insulated exterior wall
17   with appropriate use of a vapor barrier, would
18   that affect the risk of moisture infiltration?
19   A.    It could reduce it I guess.
20   Q.    Is moisture infiltration more likely to be
21   a problem in older buildings like Trinity Church
22   than in new construction?
23   A.    I couldn't, I couldn't say that.
24   Q.    Okay.  Do you have any information on how
25   the exterior wall of Chase Hall, where the Kerson
```

Page 52

```
 1   mural is located, was constructed?
 2   A.    I believe it was part of either Daniel
 3   Hecht's Declaration, and the, I think some, I
 4   want to say, I don't want to say presumptions on,
 5   on his part, but understanding of the
 6   construction at that time on how that wall may
 7   have been built.
 8   Q.    Let me, let me focus you on paragraph 13
 9   of your Declaration.  You say:  Since we do not
10   know the construction of the exterior wall and
11   the type of insulation used, it is difficult to
12   estimate what the temperature changes may be in
13   the cavity.  Is that fair?
14   A.    Yes.  I believe we know there was no --
15   yes, that is fair.
16   Q.    Okay.  So you do not have any information
17   on how the exterior wall's constructed and
18   insulated; correct?
19   A.    Correct.
20   Q.    And we discussed that this risk created by
21   the fact the mural is painted on the exterior
22   wall and that there will be a space between the
23   mural and the cover, that depends in part as well
24   on the permeability of the cover; correct?
25   A.    That's one consideration, yep.
```

Page 53

```
 1   Q.    Okay.  You've previously done work with
 2   murals that have been concealed for extensive
 3   periods of time behind a wall; correct?
 4   A.    Could you be more specific?
 5   Q.    Did you work on the Raymond Pease mural at
 6   Lone Rock Point in Perkins Hall at UVM?
 7   A.    Yes; I was asked -- yes.
 8   Q.    Can you describe that, the history of that
 9   work to me, do you recall?
10   A.    Sure.
11        I was contacted, the building had been
12   undergoing a renovation by a local company.  The
13   interior of Perkins Hall was being demolished I
14   guess is the only way I can say, demoed.
15        During that process one of the
16   construction workers in removing an interior wall
17   found what looked like a painting on that wall.
18   And I was soon after called in to provide my
19   opinion and help to conduct, or to, to implement
20   or oversee or do, I guess, the removal of that
21   mural so that they could continue on with the
22   construction of that building.
23   Q.    Was there substantial damage to the mural
24   at the time you examined it?
25   A.    Substantial damage?  I, I, I'm not sure.
```

14 (Pages 50 to 53)

Page 54

1    I mean, it was, it's an oil painting on canvas.
2    It was -- nothing substantial I don't think,
3    other than -- I don't know.  I don't know what --
4    I'm not sure what you --
5    Q.   Describe the condition of the mural.
6    A.   It was just an oil painting on canvas,
7    about 5x6 feet, applied to a wall interior.  And
8    the surface, I mean if you want to get into the
9    technicals of it, appeared that there was some
10   concern that the paint layer had, how do I want
11   to say, potential for detaching from the oil
12   canvas.  But overall it, it looked okay I guess.
13       I don't know what, I don't know what it
14   looked like before.  I, I -- there was no, there
15   was no documentation of the painting before, so I
16   had really no context of what that would have
17   looked like.
18   Q.   You were aware, though, that the mural had
19   been concealed behind that wall for nearly 30
20   years?
21   A.   Oh, yes; correct.
22   Q.   To your knowledge, were any art
23   conservators involved in erecting the wall that
24   covered the Pease mural?
25   A.   Yes; I believe at the time colleagues at

Page 55

1    the Shelburne Museum were called in, none of
2    which specialized in painting conservation.
3        I think that was a concern at the time,
4    that there was nobody qualified in the area to,
5    to call on.  And I, I think you would have to ask
6    them as to the decisions that were made to then
7    wall over the mural.
8    Q.   In your opinion, was UVM's decision to
9    enclose the Pease mural behind a wall 30 years
10   prior an intentional act of distortion or
11   mutilation of the work?
12   A.   Hmm.  No; I think -- can you just repeat
13   that again?
14   Q.   Sure.  In your opinion, was UVM's decision
15   to enclose the Pease mural behind a wall 30 years
16   prior an intentional act of distortion or
17   mutilation of the mural?
18   A.   No; I think that quite the opposite.  I, I
19   think at the time every effort was, was there to,
20   to recognize the, that this was a very important
21   piece of artwork that was done during, not the
22   WPA but the WCA; and at the time they were, they
23   just did not have the capacity to deal with it.
24   And the only way that they could see that the
25   renovation of the building was going to happen

Page 56

1    and, and they made every effort to, in a way,
2    preserve that painting by putting this wall over
3    it.
4    Q.   Were there any steps taken to ensure
5    proper preservation of the mural beyond
6    constructing the wall, to your knowledge?
7    A.   I, I am not aware; you would have to ask
8    the people that were involved then.  But I didn't
9    see any signs of interventions or anything like
10   that.
11   Q.   Is there any -- were you aware of any
12   climate control or vents behind the wall?
13   A.   No.
14   Q.   You were also involved with the so-called
15   lost mural at a synagogue in Burlington; correct?
16   A.   Yes.
17   Q.   Can you explain a little bit the history
18   of that work?
19   A.   Well my part in that, I was called in to
20   provide a second opinion on this next phase of
21   the mural.  So my work was primarily after the
22   mural had been relocated into the Ohavi Zedek
23   Synagogue.  I was looking at it from what they
24   were asking, you know, what the next steps were;
25   removing varnish and, and reintegrating all the

Page 57

1    paint loss and --
2        REPORTER:  I'm sorry; I couldn't hear
3    you.  And reintegrating all the --
4    A.   Oh, I'm sorry; I was trying to think of
5    the right word and getting too technical into
6    conservation.
7        But I was basically asked to look at the
8    surface and the varnish removal and, and then
9    compensating for any paint loss on that mural;
10   which there was, which there is a significant
11   amount of paint loss on that painting.
12   Q.   Are you familiar with the longer history
13   of the mural and how it was concealed?
14   A.   Yes, I am.
15   Q.   Okay.  And you understand that it was in a
16   commercial space for many decades?
17   A.   I mean, originally the Synagogue, it was
18   the Synagogue and then it was converted into I
19   believe apartment buildings or rental units, yes.
20   Q.   And at the time of that conversion a
21   decision was made to install a wall over it;
22   correct?
23   A.   Yes.
24   Q.   And are you aware of the purpose of
25   installing the wall at that time?

15 (Pages 54 to 57)

Page 58

```
 1    A.   I, I'm unsure what the purpose was.  I
 2  know the outcome of that was, because there were
 3  images that I, I was provided as to the content
 4  and context of the damage that I was facing.
 5  That wall was constructed with a, with an
 6  insulation.  It was an exterior wall; that wall
 7  was constructed with insulation that created a
 8  moisture trap.
 9        And but prior to that painting being
10  covered up it was in I want to say mint
11  condition; it was in very good, stable condition.
12  When that wall was taken off I would have to say
13  roughly, a large, I don't want to get into
14  percentages, but a large portion of that paint
15  layer had delaminated off of the, off of the wall
16  substrate.
17    Q.   Do you know anything about the
18  construction of the exterior wall behind that
19  mural?
20    A.   I believe this was in a, I don't want to
21  say a turret, but a half dome area.  It was a
22  plaster wall done in lath, with the exterior wall
23  being either slate roof or some other exterior, I
24  don't know if it was part of a siding, but I
25  think that's how I understood the construction of
```

Page 59

```
 1  it.
 2    Q.   Are you familiar with Rick Kerschner?
 3    A.   Yes, I am.
 4    Q.   Okay.  And are you aware that Rick was
 5  involved in making the decision to put the wall
 6  up in front of the mural?
 7    A.   No, I was not.
 8    Q.   Okay.  So going back to the mural at issue
 9  here in Chase Hall, you've testified you don't
10  know what the construction is or insulation of
11  the exterior wall in Chase Hall; correct?
12    A.   Right.
13    Q.   So you're concerned about a potential risk
14  based upon sealing the space up; but is it fair
15  to say you don't have any specific information on
16  how the creation of an enclosed cavity will
17  affect the mural?
18    A.   I'm sorry, say that again.
19        MR. BARNARD:  Could you read that back,
20    Sherri, please?
21        (Reporter read back the question:  So
22    you're concerned about a potential risk
23    based upon sealing the space up; but is it
24    fair to say you don't have any specific
25    information on how the creation of an
```

Page 60

```
 1      enclosed cavity will affect the mural?)
 2        MR. RUBIN:  Objection to the form.
 3    A.   Again, I would just go back to the, the
 4  concerns any time you're dealing with an exterior
 5  wall.
 6    Q.   You have concerns, again, based upon
 7  unknowns.  But to, to quantify those concerns you
 8  would need to know more about the construction of
 9  the wall and the permeability of the covering;
10  correct?
11    A.   I --
12        MR. RUBIN:  Objection.
13        THE WITNESS:  Sorry, Richard.
14        MR. RUBIN:  Objection as to the form of
15    the question.  Go ahead and answer.
16    A.   I, I think I -- you're asking me to
17  quantify --
18    Q.   I'm not asking you to quantify.
19    A.   No.
20    Q.   I'm asking you if you have the information
21  necessary to quantify the risk?
22    A.   I think when, I think, you know -- I mean
23  it's, it's an exterior wall; we might assume it
24  was insulated.  I mean, we might assume there was
25  a vapor barrier.  I mean, I think those were all
```

Page 61

```
 1  variables that you take into consideration.
 2        I think, again, whether they're present or
 3  not, or to what extent or type or material, it's
 4  still an exterior wall that you have the
 5  potential for, in our climate, shifts in
 6  temperature and humidity and infiltration of
 7  moisture from, from the exterior.
 8    Q.   I understand that you're testifying there
 9  was a potential, given that it's on an exterior
10  wall and given the unknowns.
11        But given those unknowns, you are unable
12  to quantify how likely it is that harmful
13  conditions will in fact be created; correct?
14        MR. RUBIN:  Objection.
15    A.   I, I don't know how to answer this one.
16  You're wanting me to quantify something.
17    Q.   I'm not wanting you to quantify something,
18  I'm asking if you --
19    A.   Well you kind of are.  But keep going;
20  sorry.
21    Q.   I'm asking if you are able to quantify,
22  given the unknowns?
23    A.   Again, I think that I, I am just playing
24  out all of the different variables of what an
25  exterior wall construction would look like.  And
```

16 (Pages 58 to 61)

Page 62

```
 1   based on my experience and knowledge of certain
 2   instances of projects that I have either been
 3   involved in or have, you know, over the past 20
 4   years, can say pretty confidently when you have
 5   an exterior wall, you are introducing a number of
 6   different areas of concern.  This shift in
 7   temperature, the shift in humidity, the, you
 8   know, the shift in, in this moisture
 9   infiltration.  Whether I can quantify it or not,
10   I --
11   Q.    I, I understand fully your answer.
12   A.    Yeah.
13   Q.    I, I just want you to answer the last
14   piece; you said whether I can quantify it or not.
15   Can you quantify it or not?
16   A.    I don't know in what, like in what realm
17   or what, in what context or what metric system
18   you would like me to quantify this.  You know,
19   it's -- I mean, I went to engineering school; I
20   understand forces and dynamics and different
21   standards of measurements and I -- that's.  You
22   know, I just don't know to what, how you -- what
23   you're asking me to be able to quantify how.
24   Q.    As an art conservator, would you feel
25   comfortable offering an opinion as to the
```

Page 63

```
 1   likelihood that there will be harm to a mural
 2   given the unknowns you've described?
 3   A.    I would say given everything I've just
 4   shared with you, I, I feel quite confident that
 5   you have a painting on an exterior wall and there
 6   is a number of variables that contribute to the
 7   concern that there is potential for damage when
 8   you have something like that in the, in the
 9   context of the system of which you are proposing
10   that this, you know, exterior wall with the air
11   space with acoustic panels, if we want to go back
12   to the, to the buildup of all of this, yeah.
13   Q.    What's the likelihood that there will in
14   fact be damage to the mural?
15        MR. RUBIN:  Objection.  To what part
16     are you talking about?
17   Q.    What is the likelihood --
18        MR. RUBIN:  Overall?
19   Q.    Given that, given that constellation of
20   system elements, what is your opinion, if you
21   have one, as to the likelihood that there will in
22   fact be damage to the mural?
23   A.    Just like I can't say that it's not
24   unlikely.  I mean, I think, again, based on my
25   experience, based on my knowledge and, and
```

Page 64

```
 1   witness to damage having been occurred to other
 2   paintings.  I mean the UVM painting, you know,
 3   was very different; I mean, we're talking about
 4   an oil painting on canvas on an interior wall.
 5        You're talking about in this case, the
 6   Kerson painting, mural on an exterior wall, then
 7   setting up again with this very small air space
 8   with this acoustic panel applied to it, and
 9   you're creating a system whereby one can only
10   presume, with the knowledge and experience that I
11   have and, and training, the likelihood of damage
12   occurring.  I don't know how much, I don't know
13   what percentage, I don't know if it's 50 percent
14   or more; but I am just saying that there are in,
15   in that system, concerns for damage to occur to
16   this painting.
17        And then I, I, I mean, and I'll just add
18   to it, you're taking away, you know, I'll just
19   jump to the next thing, you're taking away the
20   one tool that we utilize more often than not;
21   which is to -- you're, you're taking away the
22   ability to monitor this visually.  I mean, so,
23   you know, again back to your point of when, how
24   long do I think this is going to occur; you know,
25   if you covered it up, I have no idea, so.
```

Page 65

```
 1   Q.    We'll talk about that in a second.
 2   A.    Okay.  I know we're getting there; I just
 3   wanted to get, get you maybe some answers before
 4   we get to that part.
 5   Q.    Yes; thank you for your patience, and I
 6   believe you, you answered my question.
 7   A.    Okay.
 8   Q.    And I'm going to isolate it and confirm it
 9   so that we can hopefully --
10        MR. RUBIN:  I'm objecting to your
11     narrative; why don't you just ask a
12     question.
13        MR. BARNARD:  Yeah, I'm going to get to
14     it, Richard.
15   Q.    I'm going to try to ask this as clearly as
16   possible.
17        Is it correct that, and I believe you just
18   testified to this, that you cannot say --
19        MR. RUBIN:  Object to your comment as
20     to what she testified.
21        MR. BARNARD:  No speaking objections,
22     please, Richard.
23        MR. RUBIN:  I'm objecting to the form
24     of your question.
25        MR. BARNARD:  Thank you.
```

17 (Pages 62 to 65)

Page 66

1            MR. RUBIN:  You're welcome.
2      Q.    Is it correct that you cannot give a
3   specific percentage likelihood that there will be
4   damage to the mural?
5      A.    I will not give a percentage, no.
6      Q.    Thank you.
7            And the reason that you will not give a
8   percentage is because of the number of unknowns
9   correct?
10     A.    I, I'm just, I'm not going to hold myself
11  to, to a percentage.  I just, I, I won't do that,
12  no.
13     Q.    Okay.  So you, you just testified and
14  raised this in your Declaration as to a concern
15  that there will be no means to access the mural
16  and confirm whether there is damage; correct?
17     A.    Well I've said visual; I didn't say no
18  means.  But go ahead.
19     Q.    Okay.  Well, VLS has indicated that it
20  will install a humidity and temperature monitor;
21  correct?
22     A.    Yes; that's what I am aware of, yes.
23     Q.    One of the concerns that you've raised is
24  that there will be a potential for fluctuations
25  in temperature and for moisture infiltration;

Page 67

1   correct?
2      A.    Yes.
3      Q.    Would a humidity and temperature monitor
4   provide useful information about those risks?
5      A.    Sure; yes, yes.
6      Q.    Are you aware of any reason that a section
7   of the wall couldn't be removed, if necessary, to
8   confirm the status of the mural?
9      A.    A section of the proposed wall?
10     Q.    Correct.
11     A.    Am I aware?  No; that's not something, no,
12  I'm not aware of that.
13     Q.    So as far as you know, there's no reason
14  that if there were humid conditions behind the
15  wall, someone could not remove a portion of the
16  wall and confirm whether there was damage to the
17  mural; correct?
18     A.    That was not I guess -- I guess I would
19  say that would be correct, if I understood the
20  question.
21     Q.    As someone in the art conservation
22  community, have you followed the controversy of
23  the mural off of Church Street in Burlington, the
24  Everyone Loves A Parade mural?
25     A.    Yes.

Page 68

1      Q.    Okay.  You understand that there's been
2   controversy over that mural because of its
3   depiction of Vermont's history and the exclusion
4   of the Abenaki tribe?
5      A.    Yes.  I mean, I'm aware of the -- I'm --
6   yes; yes.
7      Q.    Are you aware that it's been vandalized
8   multiple times by critics?
9      A.    I believe I have, I was, I've read that,
10  yes.
11     Q.    Do you agree that vandalism is a risk for
12  controversial pieces of public art?
13     A.    Oh, sure; yes.
14     Q.    Do you agree that installing a wall over
15  the Kerson mural at Vermont Law School would help
16  prevent vandalism of that type?
17     A.    I can't say that.
18     Q.    You can't say that it would be more likely
19  to protect against someone painting over the
20  mural, for example?
21     A.    No.
22     Q.    Okay.  Have you been asked to provide an
23  opinion as to whether the wall proposed by
24  Vermont Law School will distort, mutilate or
25  modify the Kerson mural?

Page 69

1      A.    Was I asked -- I'm sorry; say that again.
2      Q.    Sure.  Have you been asked to provide an
3   opinion that it, the wall proposed by VLS will
4   distort or mutilate or modify the Kerson mural?
5      A.    No.  I was asked to provide an opinion on
6   the proposed wall covering, the materials that
7   were being used.
8            MR. BARNARD:  I'm just going to take a
9       moment and look through my notes, but I
10      think I'm close to done.
11           That's all I have.
12  EXAMINATION BY MR. RUBIN:
13     Q.    I have a couple of questions, Emily.
14     A.    Yes.
15     Q.    Over the course of the deposition you
16  discussed various aspects of the construction of
17  the proposed wall which cause concern; correct?
18     A.    Yes.
19     Q.    One thing you talked about was the use of
20  these acoustic tiles which contained rock wool;
21  right?
22     A.    Yes.
23     Q.    And you were --
24     A.    Well I should -- some, some material of
25  that nature, yes; I would just clarify that.  I

Page 70

```
 1   don't know, yeah.  Sorry; go ahead.
 2   Q.    And concern that the rock wool or similar
 3   substance had failed the Oddy test and that was
 4   of concern; correct?
 5   A.    Yes.
 6   Q.    You expressed concern about the proximity
 7   of the proposed acoustical tile wall to the
 8   surface of the mural?
 9   A.    Yes.
10   Q.    You proposed that you -- you discussed a
11   concern about the permeability of the exterior
12   wall, potential permeability of the exterior wall
13   creating a changing environment along the surface
14   of the wall?  Yes?
15   A.    Yes; yes.
16   Q.    You expressed concern about the inability
17   to examine the wall visually, the two walls,
18   actually, visually?
19   A.    Yes.
20   Q.    Or any particular system to monitor
21   humidity electronically or to have anyone, to
22   have anyone available to monitor the humidity?
23         MR. BARNARD:  Objection.
24   Q.    Did you have also a concern that there was
25   no description of anybody available to monitor
```

Page 71

```
 1   the humidity within the wall electronically?
 2   A.    Yes; I think that is a concern.
 3   Q.    Okay.  So looking at all of these factors
 4   holistically, do you have an opinion whether it's
 5   more likely than not that damage will occur to
 6   the surface of the mural if it is constructed as
 7   proposed by Vermont Law School?
 8   A.    Yes; I think I have stated that in my
 9   Declaration, yes.
10   Q.    The answer is you'd have an opinion; and
11   what is your opinion?
12         I'm not asking in terms of percentage; I'm
13   asking whether it's more likely than not in your
14   opinion that damage will occur?
15   A.    I think when you lay out the entire
16   system, I am -- there is concern that there is
17   the potential risk for damage, yes.
18   Q.    Is it more likely than not that it will
19   occur?
20   A.    Oh, I would say, I would say more likely,
21   just given -- yes; yes.
22         MR. RUBIN:  Thank you.
23   RE-EXAMINATION BY MR. BARNARD:
24   Q.    Couple of followup questions.
25   A.    Sure.
```

Page 72

```
 1   Q.    You mentioned that the acoustic panels
 2   contain rock wool or some material of that sort;
 3   correct?
 4   A.    Correct.
 5   Q.    You don't know what specific type of rock
 6   wool is contained in the acoustic tiles; correct?
 7   A.    I think they made reference to mineral
 8   wool, rock wool; I mean they're kind of, they're
 9   similar materials.  But I guess specifically, no;
10   you're correct.
11   Q.    And are you aware that different types of
12   mineral wools have different off-gassing
13   characteristics?
14   A.    Yes.  I mean, I, I would assume; I, I
15   would say yes.
16   Q.    Okay.
17   A.    Yes; I'm sorry.
18   Q.    So you don't know what the specific risk
19   of off-gassing is from the particular mineral
20   wool used in this tile; correct?
21   A.    In this specific tile, no.
22   Q.    You mentioned that some type of rock wool
23   has failed the Oddy test, but you don't know what
24   specific gas was off-gassed; correct?
25   A.    I, I would have to look through the
```

Page 73

```
 1   results to confirm what that would be.
 2   Q.    Can you say sitting here today with any
 3   certainty what gasses, if any, will be off-gassed
 4   from the acoustic tiles?
 5   A.    No, I will not do that.
 6   Q.    Okay.  And you cannot say sitting here
 7   today how any gas that might be off-gassed from
 8   the acoustic tiles would affect the mural;
 9   correct?
10   A.    I am not prepared to, no; correct.
11   Q.    You testified that in your view it is more
12   likely than not that some damage will occur to
13   the mural with the wall as constructed; correct?
14   A.    I believe I've answered that, yes, in
15   multiple ways; correct, yes.
16   Q.    But you're unable to give a particular
17   percentage; correct?
18   A.    Correct.
19   Q.    You can't say that damage might
20   occur; correct?
21   A.    Correct.
22   Q.    You can't say how extensive that damage
23   will be; correct?
24   A.    Correct.
25   Q.    You can't say what specific type of damage
```

19 (Pages 70 to 73)

Page 74

1   will occur; correct?
2   A.    I, I, I have provided examples of what
3   typical damage would look like under these type
4   of circumstances; but I will not -- you know, and
5   that's the only thing I can base that on.
6   Q.    And yet given all the many unknowns here,
7   you feel comfortable as a professional saying not
8   just that there is risk or concern, but that it
9   is more likely than not that there will be some
10   sort of damage to the mural?
11   A.    Yes.
12       MR. BARNARD:  Okay.  That's all I have.
13       MR. RUBIN:  No further questions.
14       (Discussion off record and signature
15   waived.)
16       (The deposition was concluded at
17   approximately 11:48 AM.)
18
19
20
21
22
23
24
25

Page 75

1                    CERTIFICATE
2
3       I, Sherri L. Bessery, RMR, CRR, Notary Public
4   within and for the State of Vermont, do hereby certify
5   that I reported the foregoing deposition of Emily
6   Phillips, taken on July 29, 2021.
7       I further certify that said witness was duly sworn
8   to tell the truth, the whole truth and nothing but the
9   truth, and that the foregoing was taken by me
10   stenographically and thereafter reduced to writing,
11   and the foregoing 74 pages are a full and true copy of
12   said testimony to the best of my ability.
13       I further certify that I am in no way related to
14   any parties hereto nor interested in the outcome of
15   said cause.
16       Dated at Burlington, Vermont, this 31st day of
17   July 2021.
18
19       _____
20           Sherri L. Bessery, RMR, CRR
20           Notary Public 157.0001089
             Commission Expires 1/31/23
21
22
23
24
25

20  (Pages 74 to 75)