U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 OCT 20 AM 11:03

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| SAMUEL KERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:20-cv-202 |
| ) | |
| VERMONT LAW SCHOOL, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 10)**

Plaintiff Samuel Kerson has filed suit against Defendant Vermont Law School ("VLS") under the Visual Artists Rights Act ("VARA"), 17 U.S.C. §§ 106A and 113(d), seeking to permanently enjoin VLS from concealing two murals painted by Mr. Kerson on the walls of the Jonathan B. Chase Community Center at VLS. On March 10, 2021 the court denied Mr. Kerson's request for a preliminary injunction. (Doc. 20.) The court ruled that the text of the VARA does not protect against the concealment or removal from display of artworks and concluded that the Plaintiff was unlikely to prevail on the merits. (*Id.* at 11.) The court converted VLS's pending motion to dismiss into a motion for summary judgment and directed the parties to submit supplemental briefing.

In support of its converted motion for summary judgment, VLS repeats the argument it made against a preliminary injunction: that the text of the VARA does not prohibit the permanent concealment of a work of art. (Doc. 23 at 1–2; *see also* Doc. 10 at 7–8; Doc. 21 at 3–4.) VLS further argues that the means by which it intends to conceal the murals—the permanent installation of a wooden frame covered with acoustic panels (*see* Doc. 13-1)—will not cause

"any legally cognizable modification, mutilation, distortion, or destruction of the Mural in violation of VARA." (Doc. 23 at 2.)

Plaintiff puts forth two arguments for why the court should deny VLS's motion for summary judgment, one legal and one factual. First, Plaintiff argues that the VARA prohibits VLS "from installing a permanent barrier of acoustic panels concealing and entombing the Murals" because VLS's conduct would amount to a modification or destruction of the artwork in violation of the artist's right of integrity. (Doc. 26 at 2.) Second, Plaintiff argues the factual record regarding potential future damage to the murals caused by environmental changes in temperature or air quality is insufficient to permit a decision on summary judgment. (*Id.* at 1; *see also* Doc. 31 at 2, 5–8.)

For the following reasons, the court concludes that VLS is entitled to summary judgment on Plaintiff's claims under the VARA.

**I.     Facts**

The following facts are undisputed unless noted otherwise.

**A.     Creation of the Murals**

In 1993, the artist Samuel Kerson painted two large murals on the walls of Chase Hall at VLS. (Doc. 1 ¶¶ 18–20.) The murals, titled "The Underground Railroad, Vermont and the Fugitive Slave," depict the evils of slavery and the efforts of abolitionists and Vermonters to aid slaves seeking freedom on the Underground Railroad. (*Id.* ¶¶ 19, 22.) The work consists of two panels, each 8 feet by 24 feet, painted in acrylic medium directly onto the sheetrock wall. The first panel is entitled *Slavery*. The panel depicts the violent capture of people in Africa; their forced sale at a slave auction in the United States; the brutality of slave labor; and a slave insurrection. (Doc. 6-2 at 7.) The second panel is entitled "Liberation." The panel depicts the

abolitionists John Brown, Frederick Douglass, and Harriet Beecher Stowe; Harriet Tubman arriving in Vermont; South Royalton residents sheltering refugee slaves; and Vermonters aiding escaped slaves departing for the Canadian border. (*Id.* at 8.)

### B.   Student Complaints and the Decision to Remove the Murals from View

Since at least 2001, VLS has received complaints from students expressing their discomfort with the murals. (Doc. 11-2 ¶¶ 4–8.) Students have spoken with Associate Dean for Student Affairs and Diversity and Associate Professor of Law Shirley Jefferson repeatedly about what some described as the "cartoonish, almost animalistic" depictions of enslaved African people. (*Id.*) Following complaints in 2013 and 2014, VLS attached plaques to the wall next to the artworks "explaining the purpose of the mural and its intent to depict the shameful history of slavery as well as Vermont's role in the Underground Railway." (*Id.* ¶ 6.)

Following the death of George Floyd in early 2020, Dean Jefferson concluded that she "could no longer urge the students to overlook what the mural's presence said about the atmosphere at VLS for students of color." (Doc. 11-2 at 8.) She approached VLS President Thomas McHenry to say she believed the mural should be removed, and President McHenry agreed. Their decision coincided with a student petition calling for removal of the murals. (*See* Doc. 11-4.)

On August 5, 2020, President McHenry sent Mr. Kerson a letter notifying him of the school's intent to remove or cover the murals permanently. (Doc. 6-4.) President McHenry gave Mr. Kerson the opportunity to remove the murals himself and offered to return full ownership to him. This lawsuit followed.

Public response to VLS's decision has been mixed. In December 2020, a student petition seeking to halt the destruction of the murals was circulated and delivered to President McHenry.

3

(Doc. 14-1.) Plaintiff has provided statements from both Black and white students and others who object to the removal of the murals from view. (*See* Doc. 14-1.)

Mr. Kerson believes the destruction of the murals would be prejudicial to his honor or reputation. (Doc. 1 at 7.) He believes that permanent concealment of the murals would mark this artwork as "offensive" and "unworthy to be viewed," and would damage his standing as an "artist committed to progressive causes." (Doc. 6 at 13.) Furthermore, he believes that VLS's proposed plan to cover his works of art would destroy, distort, mutilate, or otherwise modify the murals.

C.     **VLS's Plan to Conceal the Murals**

Mr. Kerson and VLS agree that the sheetrock cannot be removed without damaging the murals. VLS proposes to cover the works of art by building a wooden frame around the murals that will support acoustic panels. The panels will permanently conceal the murals from view. Neither the frame nor the panels will actually touch the murals.

VLS has submitted detailed information on its plans to permanently conceal the murals from view. (*See* Docs. 13-1, 13-2.) In a declaration filed with the court, Jeffrey Knudsen, the Building and Grounds Supervisor at VLS, stated the following:

> 3. . . . [T]he frame and cover will consist of three layers. The first layer will be an outer frame constructed of approximately 1" x 4" wood, affixed to the wall surrounding the mural, likely with threaded bolts or screws. This will be the only part of the framework and cover to make contact with the wall. It will not make contact with the mural itself.
>
> 4. The second layer will be a wooden overlay frame to hold the acoustic panels, constructed of approximately 1¼" x 6" boards and affixed to the first layer (the outer frame), likely using screws. As depicted in the construction drawings, this second level of framing will include uprights that will pass over the mural, but will be set off from the surface of the mural by approximately 1" (as they will be built on top of the outer frame).
>
> 5. The third layer will be the acoustic panels themselves, which will sit on top of the second level of frame and be affixed to the frame with mounting hardware

4

> supplied with panels. As detailed in the cut sheet that was submitted as Exhibit A to my earlier Declaration, the panels are 2" deep and are covered in fabric, with a mineral wool core.
>
> 6. The frames are designed to maintain space between the acoustic panels and mural to prevent the panels from deflecting into the mural. Page three of the construction drawings presents a profile view of the frames and panels; as depicted there, the frames will maintain a distance of approximately 2¼" between the mural and the acoustic panels.
>
> 7. As with any construction project, details may need to be adjusted in the field to account for unanticipated conditions. Any such adjustments would be made in a way intended to avoid contact with the mural.

(Doc. 13-1.) The declaration is accompanied by construction drawings that illustrate the three layers of the screen.

In opposing VLS's motion for summary judgment, Plaintiff argues, and submits declarations contending, that there exist "significant factual questions as to the accuracy of VLS's contention that its proposed concealment of the Murals will not damage or destroy the Murals." (Doc. 26 at 5; *see also* Doc. 31 at 7–8.) Plaintiff identifies three presently unanswered questions which, he argues, are critical to this court's consideration of the motion for summary judgment. These questions relate to:

> the size of the panels, the mode of construction of the panels, whether the panels create a closed environment resulting in condensation issues, . . . the monitoring of VLS's proposed system to control humidity, the presence of vents, and how degradation of and damage to the Mural's paint is determined and, if necessary, repaired . . . [and] whether the use of acoustic panels to conceal the Murals will cause an acidic atmosphere as well as trapping moisture behind the panels.

(Doc. 26 at 5.) Plaintiff contends that "all of these concerns must be fully investigated and resolved before a determination can be made whether or not VLS's stated plan will damage or destroy the Murals." (*Id.* at 6.)

One of the declarations submitted by Plaintiff is from Daniel Hecht, a carpenter and artist who lives in Montpelier, Vermont. (Doc. 26-1.) Hecht's Declaration expresses the following concerns regarding VLS's proposed concealment mechanism:

    a. VLS has acquired 8' panels to conceal an 8' mural, but the frame must be several inches from the mural, so the 8' panels will be too small for the frame.

    b. There is no description of how the panels are constructed. Are they covered with fabric glued to their surface with a glue which will form an acid environment as they degrade? Is there a plywood backing, and how is it affixed to the panel?

    c. Will the panels create a closed environment and result in condensation of moisture on the paint, causing damage?

    d. VLS proposed some monitoring system for humidity, acknowledging this potential problem. What exactly is the monitoring technology, and who will monitor the monitoring device?

    e. Will there be vents to allow for air circulation? Will this be sufficient?

    f. Who will determine if the environment degrades the paint and damages the mural? Who will repair the damage?

(*Id.* ¶ 3.)

Plaintiff also submitted a declaration from Emily Phillips, an art conservationist and principal of Phillips Art Conservation, LLC, who specializes in the conservation of large-scale paintings and murals. (Doc. 31-2.) Phillips' Declaration evaluates whether VLS's proposed concealment mechanism complies with recognized good practices of art conservation, and concludes:

> I believe the proposed wall presents a significant potential risk to the integrity and longevity of the murals. It is inconsistent with good practices of art conservation and preservation. Its purpose was to hide the murals without any consideration as to its effect on the murals, other than the wall not touch the surface of the painted walls. The acoustic materials are of an unknown material that is not generally used to encase art and has not been tested as to its impact on the art. The ambient environment created by the wall may lead to mold or other biological growth or may otherwise cause conditions that will degrade the murals. Lastly, there is no

6

means of monitoring the impact of the wall on the murals and no means of remediating any adverse condition that may develop.

(*Id.* at 2.)

Plaintiff's counsel also sought the opinion of Harriet Irgang Alden, who recently retired as an expert witness in the field of painting conservation. (*See* Doc. 26-2 ¶¶ 7–10.) By email, she wrote:

> In reviewing the documents, I was surprised to learn that VLS plans to use acoustic panels in front of the murals. Since this is not a use that acoustic panels are designed for there needs to be a review of what impact they would have on the preservation of the murals. Of primary concern are any off-gassing fumes from adhesives used in their manufacture that would cause an acidic atmosphere as well as the trapping of moisture behind the panels.

(Doc. 26-1 at 4.) During a follow-up phone call with Plaintiff's counsel, Harriet Irgang Alden expressed "concern[s] about [the] potential for mold and moisture to impact the murals in the proposed configuration." (Doc. 26-2 at 3.)

## II.   The Visual Artists Rights Act, 17 U.S.C. §§ 106A, 113

The right of the artist to protect a reputational interest in the attribution and integrity of his or her work was first recognized in European law. This interest is often described as one of moral right. "The rights spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995). Article 6*bis* of the Berne Convention for the Protection of Literary and Artistic Works gave explicit protection to the artist's moral right:

> Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

Berne Convention for the Protection of Literary and Artistic Works art. 6*bis*, July 14, 1967, 11850 U.N.T.S. 828.

In 1988, the United States joined the Berne Convention in order to improve international copyright protection for American authors and artists. The Senate action acceding to the Convention excluded the doctrine of moral rights from the legal principles accepted by the United States in joining the Convention. *See* S. Rep. No. 100-352 (1988). This decision was motivated, at least in part, by a desire to allow the United States' moral rights jurisprudence "to continue to evolve." Visual Artists Rights Act of 1987: Hearing on H.R. 3221 before the Subcomm. on Cts., C.L., and the Admin. of Justice of the H. Judiciary Comm., 100th Cong. 13 (1988) (Statement of Rep. Carlos Moorhead).

In 1990, Congress passed the VARA. It forms part of the Copyright Act, 17 U.S.C. § 101 et seq., establishing the legal framework in American law for the sale and publication of visual art and literature. In contrast to other provisions that protect the artist's economic interests, the VARA protects the reputational interest of the artist. The VARA "creates a scheme of moral rights for artists." *Castillo v. G&M Realty L.P.*, 950 F.3d 155, 165 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 363 (2020). The VARA is "analogous to Article 6*bis* [of the Berne Convention] … but its coverage is more limited." *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, n. 21 (1998). "With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity, and, in the case of works of visual art of 'recognized stature,' the right to prevent destruction." *Carter*, 71 F.3d at 83. The right of integrity "allows the [artist] to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." *Id.* at 81.

### III. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). However, "to show a genuine dispute, the nonmoving party must provide hard evidence, from which a reasonable inference in its favor may be drawn. Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuinely disputed fact." *Hayes v. Dahlke*, 976 F.3d 259, 267–68 (2d Cir. 2020) (cleaned up). And although the court "must disregard all evidence favorable to the moving party that the jury is not required to believe," the court credits "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*

### IV. Plaintiff's Claims

In this case, we are concerned with the artist's right of integrity. The right of integrity limits what a subsequent owner can do to an artwork. It also protects works of recognized stature against destruction. The provisions at issue confer the following rights on artists:

> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. §§ 106A(a)(3)(A), (B).

Exceptions to these provisions appear at 17 U.S.C. §§ 106A(c)(1) and (2):

(1) The modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A).
(2) The modification of a work of visual art which is a result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

A final exception relevant only to works such as murals that form part of a building appears at 17 U.S.C. § 113(d). It exempts works installed in a building prior to passage of the VARA in 1990 as well as subsequent works for which the artist has executed a waiver. Neither of these exceptions applies in this case.

### A.   Is concealment of an artwork a modification proscribed by the VARA?

Plaintiff argues that "[p]ermanent covering of the Murals, in and of itself, distorts, mutilates, or otherwise modifies the work." (Doc. 19 at 8.) Defendant replies that "allowing a work [that cannot be removed] to be covered is consistent with VARA's terms and the intention of the presentation exception." (Doc. 10 at 8.) Defendant argues that concealment is different from either modification or destruction and that an artist has no right under the VARA to prevent an owner from "covering his or her work and removing it from view" so long as the work remains intact. (*Id.* at 7.)

Modification appears as one of three actions falling short of outright destruction that give rise to VARA protections of the right of integrity. These actions are the intentional distortion, mutilation, or other modification of the work. The first two actions plainly require some change to the mural itself. Few would describe concealing the mural as a "distortion" or a "mutilation." The real question before the court is whether there is something about the word "modification" that invites a broader definition that includes the concealment of the artwork behind a fixed wall.

10

In construing the words of a statute, courts turn to their ordinary meanings. "[E]very word employed in the constitution is to be expounded in its plain, obvious and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." Joseph Story, *Commentaries on the Constitution of the United States* 157–58 (1833). Although Justice Story was writing about the language of the Constitution, his advice applies equally to statutory language. Particularly when words receive no special definition in the statute, common usage and dictionary definitions are the surest guide to statutory meaning. *See Greenery Rehab. Grp., Inc. v. Hammon*, 150 F.3d 226, 231 (2d Cir. 1998) ("[I]ndividual statutory words are assumed to carry their ordinary, contemporary, common meaning.").

Understanding the meaning of modify is made easier because "modification" is a word with a particular legal provenance. It generally refers to an incremental change to the object at issue. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion. See, e.g., Random House Dictionary of the English Language 1236 (2d ed. 1987) ("to change somewhat the form or qualities of; alter partially; amend"); *Modify,* Webster's Third New International Dictionary (1981) ("to make minor changes in the form or structure of; alter without transforming"); 9 Oxford English Dictionary 952 (2d ed. 1989) ("to make partial changes in; to change (an object) in respect of some of its qualities; to alter or vary without radical transformation"); Black's Law Dictionary 1004 (6th ed. 1990) ("[t]o alter; to change in incidental or subordinate features; enlarge; extend; amend; limit; reduce")).

Lower court decisions reaching the same conclude include: *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1037 (6th Cir. 1995) ("reasonable modification connotes moderate change) (cleaned up); *Pine Tree Med. Assocs. v. Sec'y of Health and Hum. Servs.*, 944

11

F. Supp. 38, 42 (D. Me. 1996) ("the definition of modify is an alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject matter intact.") (internal citations omitted). The common theme in all these decisions is that modify refers to small-scale changes and adjustments. No dictionary definition of modify and no conventional use of the word includes "concealment" as a synonym.

As the court wrote previously in denying the motion for a preliminary injunction, we do not frequently use "modify" to describe moving an object to a location where it cannot be seen. We have other words for that purpose: *secrete*; *conceal*; *hide*; even *stash* or *stow away*. Giving a word an unexpected or obscure meaning—such as stretching the definition of "modification" to include "concealment"—reduces the likelihood that we are reaching the meaning Congress intended. Understanding what a statute means is not an occasion for novel or surprising definitions of the words used.

There is a second reason why the court limits the definition of "modification" to changes made to the artwork itself. That approach is consistent with another provision of the VARA. 17 U.S.C. § 106A(c)(2) excludes modification "which is the result of conservation, or of the public presentation, including lighting and placement." Decisions about display and conservation, essentially the handling of the artwork by its owner through the years following acquisition, are not "modifications" that give rise to rights under the VARA.

Plaintiff argues that since section 106A(c)(2) speaks of modifying through presentation, concealment—also a form of presentation—should also be considered a modification. But the clear intent of the exception is the opposite. Public presentation is excluded as a "modification." Related forms of presentation such as moving a work of art to a less desirable location within the museum, excluding the work from a travelling exhibit, and the range of other

12

possible decisions about display are not actionable modifications either. Removal from display is a decision about public presentation and placement. Since the manner in which an artwork is shown is not a modification, the manner in which it is *not* shown is not a modification for purposes of the VARA either.

One other court decision has ruled that concealing an artwork from view is not a modification or distortion. *See Mass. Museum of Contemp. Art Found., Inc. v. Büchel*, 593 F.3d 38 (1st Cir. 2010). In *Büchel*, the First Circuit considered the decision of a museum to place tarps over an unfinished work forming part of a larger show. Although the artist won a remand on issues not relevant here, the appeals court rejected the artist's claim that the act of concealing the work violated his right of integrity: "[A]lthough the installation unquestionably looked different with the tarpaulins partially covering it, we agree with the district court that the mere covering of the artwork by the Museum, its host, cannot reasonably be deemed an intentional act of distortion or modification of Büchel's creation." *Id.* at 61.

In the present case, there is even less basis for a claim based on the right of integrity. After the construction of the acoustic panel wall, the murals will not "look different" as in the *Büchel* ruling. Indeed, they will not be seen at all. The murals will have the same status as a portrait or bust that is removed from public exhibition and placed in storage. Their concealment violates neither the right of attribution—because there is no confusion about who painted the murals—nor the right of integrity, as they will not be seen in a manner different from that created by the artist.

B.   **Is damage caused by environmental conditions a modification?**

Plaintiff argues that the murals may be considered modified for purposes of the VARA due to harmful environmental conditions created by the acoustic panel wall. Although the wall

13

will not touch the murals, the space between them is narrow and air circulation will be restricted. Plaintiff has supplied opinions from three experts who stated that although they could not identify the timing or causal mechanism, damage to the murals was likely to occur over time. The experts express no opinion that immediate harm will result. The murals will remain in the heated, interior space they have occupied for almost thirty years. The experts' concern is that changes in temperature, acidity or humidity may permit mold to develop. They also expressed concern that the materials composing the acoustic panels had not been tested to determine if they will release gases that could damage the piece.

The VARA is explicit in excluding environmental changes from the modifications that an artist may seek to prevent. 17 U.S.C. § 106A(c)(1) states, "[t]he modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A)." The Plaintiff's experts are clearly describing changes that they fear may occur over time as a result of exposure to gases or humidity. These are potential harms that take time to develop. They may fairly be considered sources of damage that are "the result of the passage of time" and are excluded from the VARA.

In *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526 (S.D.N.Y. 2001), the district court rejected an artist's claim that the storage of a monumental clay statue outdoors in inclement weather violated the artist's right of integrity because the face of the statue deteriorated in the rain. In *Flack* there was no doubt that the artwork changed for the worse after it was left outside. Relying on the exception for damage occurring over time, the court dismissed the artist's VARA claim on the ground that the VARA excludes all modifications that occur through the passage of time, even those caused by gross negligence. *Id.* at 534. The same

14

principle applies in this case. Change to an artwork over time is not actionable under VARA even if better conservation measures could have prevented it.

      C.     **Is concealment a form of destruction of the work?**

The question of "destruction" is easier. The parties agree that for purposes of summary judgment, the murals qualify as "a work of recognized stature" and are consequently protected from intentional or grossly negligent destruction. *See* 17 U.S.C. § 106(a)(3)(B). Intentionally painting over the murals or pulling down the sheetrock would violate the artist's rights under the VARA as would a destructive act of "gross negligence." *See Castillo*, 950 F.3d at 171 (upholding damage award for murals whitewashed by property owner). No such destructive actions are at issue here.

No court has ruled that the VARA protects the artist's interest in keeping his art visible or on display. In *English v. BFC & R E. 11th St. LLC*, No. 97 Civ. 7446(HB), 1997 WL 746444, at *6 (S.D.N.Y. Dec. 3, 1997), *aff'd sub nom. on other grounds, English v. BFC Partners*, 198 F.3d 233 (2d Cir. 1999), the trial court rejected the argument that permanently concealing an exterior mural from view is the equivalent of destroying it. The court noted that "[a] contrary holding would effectively allow building owners to inhibit the development of adjoining parcels of land by simply painting a mural on the side of their building." *Id.*

As with modification, the court considers the conventional meaning of destruction. It means to bring an end to something as through force or violence. Unlike a modification, it is not incremental and it is frequently sudden. Its most compelling feature is the relative completeness of the change worked on its object. Destroy means to "damage (something) so thoroughly as to make unusable, unrepairable, or nonexistent; to ruin." *Destroy*, Black's Law Dictionary (11th ed. 2019). In the context of the VARA, destruction of an artwork "is defined as 'to tear down or

break up.'" *Bd. of Managers of Soho Int'l. Arts Condo. v. City of New York*, No. 01 Civ. 1226(DAB), 2005 WL 1153752, at *3 (S.D.N.Y. May 13, 2005) (quoting *American Heritage Dictionary of the English Language* (4th ed. 2000)).

There is no evidence in this record that Defendant has any intention of destroying the murals or that such a result is likely. By erecting a solid barrier—offset from the surface of the murals—defendant seeks to forestall any claim that it has destroyed the murals, even though they may never be seen again. For purposes of the VARA, concealing the murals behind a wall of acoustic panels is the same as removing a painting from a gallery and storing it out of public view. In either case, the art has not been "destroyed."

It is necessary to return to the question of environmental harm in the context of destruction. In the summary judgment context, the court accepts as true the statements provided by the three experts. These are that moisture or an acidic environment may cause damage (Doc. 26-1), mold may develop (Doc. 31-2), or that the adhesives used in the acoustic panels may emit harmful gases and the panels may trap moisture. (Doc. 26-2 at 3.) None of the experts are able to provide specific predictions of when or how they believe harm will occur. Rather, they raise questions about potential conditions such as high humidity or acidic gas that may develop.

The court accepts these opinions as representing the sincere beliefs and concerns of the experts. At summary judgment, the court must also accept these opinions as the experts' last word and the strongest expression of their views. The court allowed additional time for the parties to retain and disclose these experts. It is insufficient to suggest that the experts might develop new opinions between the motion hearing and a trial.

The question then becomes: are these opinions that some form of degradation of the murals is more likely than not to occur sufficient to prove that the erection of the wall will

16

destroy the artwork? "Destruction" as it is used in the VARA is not subject to the exceptions for harm due to conservation, display, or the passage of time. These apply only to modifications.

The court returns to the conventional definition of destruction. In contrast to an incremental modification, destruction connotes obliteration and total loss. Plaintiff's experts do not describe potential processes even close to such an outcome. They fear deterioration, not destruction, and for that reason, their concerns are more fairly categorized as concerns of modification or partial damage. These are excluded from the VARA when they occur over time or due to actions related to display or conservation—exactly the type of actions proposed by VLS. There is no record evidence before the court that, if believed, would support a finding that VLS's proposed course of action can fairly be construed as destroying the murals. In the absence of such evidence, summary judgment on that issue is appropriate.

## CONCLUSION

The court GRANTS the Defendant's motion for summary judgment. Defendant shall submit costs, if applicable, within 10 days after which time the court will enter final judgment in favor VLS.

Dated at Rutland, in the District of Vermont, this 20th day of October, 2021.

Geoffrey W. Crawford, Chief Judge
United States District Court