21-2904
*Kerson v. Vermont Law School, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2022

(Argued: January 27, 2023      Decided: August 18, 2023)

No. 21-2904

————————————————

SAMUEL KERSON

*Plaintiff-Appellant,*

-v.-

VERMONT LAW SCHOOL, INC.

*Defendant-Appellee.*

————————————————

Before:      LIVINGSTON, *Chief Judge,* CABRANES, *Circuit Judge,* and KOVNER,
             *District Judge.*[*]

Plaintiff-Appellant Samuel Kerson painted two large murals directly onto
the walls inside a building on the campus of Defendant-Appellee Vermont Law
School, Inc.   The work stirred controversy, which eventually prompted the law
school to erect a wall of acoustic panels around the murals to permanently conceal
them from public view.   Kerson brought suit against the law school, alleging that

—————————————

[*] Judge Rachel P. Kovner of the United States District Court for the Eastern District
of New York, sitting by designation.

obscuring his work behind a permanent barrier violated his rights under the Visual Artists Rights Act of 1990 ("VARA"), which creates a cause of action for artists to prevent the modification and, in certain instances, destruction of works of visual art.   But merely ensconcing a work of art behind a barrier neither modifies nor destroys the work, as contemplated by VARA, and thus does not implicate VARA's protections.   Accordingly, the judgment of the United States District Court for the District of Vermont (Crawford, *J.*) granting summary judgment to the law school is **AFFIRMED**.

FOR PLAINTIFF-APPELLANT:             STEVEN J. HYMAN (Oliver R. Chernin, *on the brief*), McLaughlin & Stern, LLP, New York NY.

Richard I. Rubin, *on the brief*, Rubin, Kidney, Myer & Vincent, Barre, VT.

FOR DEFENDANT-APPELLEE:             JUSTIN B. BARNARD (Karen McAndrew, *on the brief*), Dinse P.C., Burlington, VT.

(Lia N. Ernst, ACLU Foundation of Vermont, Montpelier, VT, *for* American Civil Liberties Union of Vermont, as *amicus curiae*)

DEBRA ANN LIVINGSTON, *Chief Judge*:

In 1993, Plaintiff-Appellant Samuel Kerson ("Kerson") painted two large murals (the "Murals"), together entitled *The Underground Railroad, Vermont and the Fugitive Slave*, directly onto the sheet rock walls inside a building on the campus of Defendant-Appellant Vermont Law School, Inc. ("VLS" or the "Law School"). The work commemorates Vermont's role in the Underground Railroad, depicting

scenes from the United States' sordid history with slavery and Vermont's participation in the abolitionist movement.   Responding to concerns within the Law School community that the Murals' depiction of this history was, in fact, offensive, the Law School informed Kerson in 2020 of its intent to erect a wall of fabric-cushioned acoustic panels, which would permanently conceal the Murals from public view.   Kerson objected and filed suit to enjoin the Law School from following through with this plan on the grounds that ensconcing the Murals behind a wall violated his rights under the Visual Artists Rights Act of 1990 ("VARA"), Pub. L. No. 101-650 (tit. VI), 104 Stat. 5089, 5128–33 (codified in scattered sections of 17 U.S.C.).[1]   The United States District Court for the District of Vermont (Crawford, *J.*) denied Kerson's motion for a preliminary injunction and subsequently granted summary judgment to the Law School on Kerson's VARA claim, after which the Law School installed the panels.   Kerson now appeals.

In enacting VARA, Congress enshrined an artist's moral rights of attribution and integrity for the duration of the artist's lifetime.   VARA establishes a scheme of protection calibrated to mediate between artists' rights to protect their artistic

---

[1] While the relevant statutory language is referenced throughout this opinion, for full context and ease of reference, the operative provisions of VARA are reproduced in full in the statutory appendix included at the end of this opinion.

reputation and the integrity of their works and art owners' rights to control the works in their possession.   To this end, authors of qualifying works of visual art may invoke VARA to prevent the modification and destruction of their art, albeit with some exceptions.   But hiding the Murals behind a barrier neither modifies nor destroys them and, therefore, does not violate VARA.   Because VARA does not afford artists a categorical right to demand that their works remain on display, we affirm the judgment of the district court.

## BACKGROUND

### I.   Factual Background[2]

Kerson is a multi-disciplinary artist who, since the 1970s, has created and exhibited numerous works of visual and performance art.   He is particularly recognized as a muralist focused on themes of social justice, having completed at least three large-scale murals (including those at issue in this appeal) that were put on public display in Nicaragua and the United States.   This dispute centers on actions taken toward what Kerson considers his "most ambitious murals work," *The Underground Railroad, Vermont and the Fugitive Slave*.   App'x 22.

---

[2] In reviewing a grant of summary judgment, "we construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."   *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks, alterations, and citation omitted).

In 1993, Kerson conceived of the idea to create an artistic commemoration of Vermont's involvement in the Underground Railroad and its efforts to combat the evils of slavery in the United States.   That year, Kerson and VLS entered into a written agreement for Kerson to paint two murals on the walls of the upper level of the Jonathan B. Chase Community Center (the "Chase Community Center") in a space used for student study and school gatherings.   As completed, the work consists of two panels of acrylic paint, each 8 feet by 24 feet in size, rendered directly onto the drywall of the Chase Community Center.   The work comprises eight distinct scenes (four per panel), spanning the history of American slavery, from the capture of Africans in their homeland through the abolitionist movement.[3]   Upon their completion, the Murals remained on display at the Chase Community Center, freely available for the public to view.

The Murals have not been without controversy.   Since at least 2001, VLS has received complaints about the Murals from community members who expressed their discomfort with how the Murals presented black people, and as

---

[3] The first panel, entitled *Slavery*, includes four scenes depicting (1) the capture of people in Africa; (2) their sale in the United States; (3) slave labor; and (4) a slave insurrection.   The second panel, entitled *Liberation*, portrays (1) Harriet Beecher Stowe, John Brown, and Frederick Douglass; (2) Harriet Tubman arriving in Vermont; (3) residents of South Royalton, Vermont sheltering refugee slaves; and (4) Vermonters assisting escaped slaves.

early as 2013, the VLS Diversity Committee considered removing them.    Among

the concerns, viewers perceived the Murals as depicting enslaved African people

"in a cartoonish, almost animalistic style," App'x 62, with "large lips, startled eyes,

big hips and muscles eerily similar to 'Sambos' or other racist . . . caricatures,"

App'x 67.    Beyond these stereotypical representations, some also took issue with

the Murals' depiction of "white colonizers as green, which disassociates the white

bodies from the actual atrocities that occurred."    App'x 73.    In light of such

complaints, in 2014, VLS installed plaques beside the Murals to explain their

"intent to depict the shameful history of slavery as well as Vermont's role in the

Underground Railway."    App'x 62.    Calls to remove the Murals escalated

during the summer of 2020, when VLS President Thomas McHenry ("McHenry")

received a petition, endorsed by more than 100 students, alumni, faculty, and staff,

demanding the removal and replacement of *The Underground Railroad, Vermont and*

*the Fugitive Slave.*

The Law School initially considered painting over the Murals, unaware that

VARA prohibits certain modifications of a work during the artist's lifetime

without the artist's consent.    Upon learning of the limitations imposed by VARA,

in August 2020, McHenry sent a letter to Kerson advising him that unless he

arranged to remove the work within 90 days of his receipt of the letter, VLS

"[would] proceed to remove or cover the mural as it deems appropriate."   App'x

42.   Advised of the Law School's plans, Kerson arranged for carpenters to inspect

the Murals, who determined that they could not be separated from the drywall

without being disfigured.   Determined to shield the work from public view, VLS

installed a temporary cloth curtain to shroud the Murals while developing a more

permanent plan to render them permanently unviewable.

VLS ultimately settled on concealing the Murals behind a barrier of fabric-

cushioned acoustic panels, which was installed after the conclusion of the district

court proceedings.   The barrier consists of three layered components: (1) a thin

wooden frame affixed to the wall surrounding the Murals, bordering, but not

touching Kerson's work; (2) a wooden overlay frame constructed of thin wooden

boards fastened to the outer frame to act as a surface for the acoustic panels, sitting

approximately one inch from the face of the Murals; and (3) a series of cushioned

acoustic panels mounted to the overlay frame.   The acoustic panels, now fully

constructed, are suspended approximately two inches away from the Murals'

surface.

## II.   Procedural History

Confronted with the prospect of having one of his major works permanently concealed, Kerson filed suit against the Law School and sought a preliminary injunction to enjoin it from affixing acoustic panels over his Murals.   Kerson invoked his rights under VARA to prevent what he perceived as the Law School's "destruction" or "intentional distortion, mutilation, or other modification" of the Murals.   17 U.S.C. § 106A(a)(3)(A)–(B).

The district court denied Kerson's motion for a preliminary injunction, concluding that he had failed to establish a likelihood of success on his VARA claim.   *See Kerson v. Vt. L. Sch., Inc.*, No. 20 Civ. 202, 2021 WL 4142268 (D. Vt. Mar. 10, 2021).   The court rejected Kerson's contention that the Law School's plan to obscure the Murals threatened to destroy or even modify them.   The district court explained that, as used in VARA, "modification means alteration of the physical art object," which is distinct from "conceal[ing] it from view."   *Id.* at *5.   And "destroy," according to the district court, "means to damage in an irreparable fashion as in burning, tearing or discarding an artwork."   *Id.*   Because "the language of the VARA does not include a protection against concealment or removal from display of artworks by the owner," the district court concluded that

8

Kerson was "unlikely to obtain a final judgment . . . enjoining the construction of the wall of acoustic panels[.]"   *Id.* at *6.

Next, the district court, consistent with its preliminary ruling on the merits, granted summary judgment to VLS, holding that VARA does not prohibit the permanent concealment of a work of art, absent any physical change to the work itself.   Relying on the ordinary meaning of the statutory term "modification," the district court reasoned that "we do not frequently use 'modify' to describe moving an object to a location where it cannot be seen."   App'x 220.   The district court was similarly unmoved by Kerson's argument that the Law School threatened to "modify" the Murals by covering them with acoustic panels that could create environmental conditions that might damage the Murals over time.   It reasoned that VARA renders non-actionable modifications that are "a result of the passage of time," 17 U.S.C. § 106A(c)(1), "even if better conservation measures could have prevented [them]," App'x 223.   Finally, based on "the conventional definition of destruction," which "connotes obliteration and total loss," and the assumption that the Murals qualify as "a work of recognized stature," the court rejected Kerson's contention that entombing the Murals behind a solid barrier or exposing

them to deleterious environmental conditions was tantamount to destroying them. App'x 223, 225.

Having secured a judgment in its favor, the Law School proceeded to install the wall of acoustic panels blocking the Murals from view.   This appeal followed.

## DISCUSSION

"We review a grant of summary judgment *de novo*."   *Power Auth. v. M/V Ellen S. Bouchard*, 968 F.3d 165, 170 (2d Cir. 2020).   Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "No genuine dispute of material fact exists when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."   *McKinney v. City of Middletown*, 49 F.4th 730, 737–38 (2d Cir. 2022) (internal quotation marks and citation omitted).   Where the disposition presents a legal issue of statutory interpretation, "we review *de novo* whether the district court correctly interpreted the statute."   *Power Auth.*, 968 F.3d at 170 (internal quotation marks and citation omitted).

Kerson appeals from the district court's grant of summary judgment to the Law School, asserting that the court below adopted an overly narrow construction of the substantive rights VARA confers upon artists.   In Kerson's view, he may

compel VLS to deconstruct the barrier covering the Murals because VARA empowers artists to prevent (1) the "intentional distortion, mutilation, or other modification" of a work of visual art, and (2) the "[intentional or grossly negligent] destruction of a work of recognized stature."    17 U.S.C. § 106A(a)(3)(A)–(B). The wall of acoustic panels surrounding his Murals implicates VARA's protections, Kerson contends, because permanently concealing an immovable work not only modifies it, but also destroys it for all intents and purposes.    In addition, Kerson seeks to forestall the Law School from exposing the Murals to a potentially toxic environment behind the acoustic panels that, according to him, could also result in the work's destruction.    For the following reasons, VARA does not provide Kerson recourse for the Law School's decision to cover the Murals with a solid barrier.

## I

"VARA was enacted in 1990 as an amendment to the Copyright Act, to provide for the protection of the so-called 'moral rights' of certain artists."    *Pollara v. Seymour*, 344 F.3d 265, 269 (2d Cir. 2003) (citation omitted).    Moral rights, which are of relatively recent vintage in American jurisprudence, "afford protection for the author's personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale

11

or licensing." *Id.* (internal quotation marks and citation omitted); *see also Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) ("The term 'moral rights' has its origins in the civil law and is a translation of the French *le droit moral*, which is meant to capture those rights of a spiritual, non-economic and personal nature."). Such rights "spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." *Carter*, 71 F.3d at 81 (citation omitted).

While the concept of moral rights can capture a range of artistic protections, two features are secured in nearly every jurisdiction that recognizes such rights: attribution and integrity. *Id.* Broadly speaking, "[t]he right of attribution . . . consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work." *Id.* (citations omitted); *accord Castillo v. G&M Realty L.P.*, 950 F.3d 155, 165 (2d Cir. 2020). "The right of integrity allows the artist to prevent any deforming or mutilating changes to his work, even after title in the work has been

transferred." *Castillo*, 950 F.3d at 165 (internal quotation marks, alteration, and citation omitted).   In some jurisdictions the integrity right extends to protect artwork from destruction; whether the right extends this far typically depends on the jurisdiction's conception of moral rights as either "stress[ing] the public interest in preserving a nation's culture"—in which case destruction is prohibited—or "emphasiz[ing] the author's personality"—in which case destruction is "seen as less harmful than the continued display of deformed or mutilated work that misrepresents the artist[.]"   *Carter*, 71 F.3d at 81–82.

VARA establishes a scheme of moral rights for authors of works of visual art that includes three actionable rights, caveated by a series of exceptions.   The protected rights are: (1) the right of attribution, (2) the right of integrity, and (3) the right to prevent destruction of works of visual art of "recognized stature."   *See* 17 U.S.C. § 106A(a); *see also Carter*, 71 F.3d at 83.   Kerson's claim implicates the latter two rights—those of integrity and to prevent destruction.   As pertinent here, VARA provides that the author of a "work of visual art," "shall have the right":

> (A)   to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or

> modification of that work is a violation of that right, and
>
> (B)   to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a)(3)(A)–(B).   As these provisions indicate, VARA protects *all* works of visual art from intentional distortion, mutilation, or other modification prejudicial to an artist's honor or reputation but protects only works of "recognized stature" from destruction.[4]   In addition, destructions fall within the ambit of VARA's prohibitions if done with intent or gross negligence, whereas distortions, mutilations, or modifications must be effected with intent.[5]

VARA sets forth two primary exceptions to the above rights afforded to artists.   The first, known as the "passage of time exception," provides that "[t]he modification of a work of visual art which is a result of the passage of time or the

---

[4] There is no dispute that the Murals are a "work of visual art" and thus qualify for protection under VARA.   *See* 17 U.S.C. § 101 (defining "work of visual art," in relevant part, as "a painting, drawing, print, or sculpture, existing in a single copy").   In addition, VLS conceded for purposes of summary judgment that the Murals are "a work of recognized stature" protectable under 17 U.S.C. § 106A(a)(3)(B).

[5] In addition, VARA rights cannot be transferred or assigned, but can be waived in a writing signed by the artist that "specifically identif[ies] the work, and uses of that work, to which the waiver applies[.]"   17 U.S.C. § 106A(e)(1).   Absent such a waiver, the artist retains rights under VARA for the duration of his or her lifetime, notwithstanding a transfer of ownership of the work or assignment of the corresponding copyright.   *Id.* § 106A(d)(1), (e)(2).

inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A)."   *Id.* § 106A(c)(1).   The second, termed the "public presentation exception," establishes that "[t]he modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence."   *Id.* § 106A(c)(2).   Notably, a modification that would otherwise fall within the public presentation exception can give rise to liability if the modification was the result of gross negligence, whereas the passage of time exception contains no such carveout.

VARA additionally contains provisions specific to works of art, like the Murals, that are incorporated into a building.   Where a work is incorporated "in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work," VARA does not prevent the building owner from removing the work if the artist and owner execute a written instrument "that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its

removal[.]"   *Id.* § 113(d)(1); *see also Castillo*, 950 F.3d at 165.[6]   By contrast, for an incorporated work that "can be removed from the building without [its] destruction, distortion, mutilation, or other modification," a building owner cannot remove the work unless the owner first "ma[kes] a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art[.]"   17 U.S.C. § 113(d)(2)(A).   VARA also permits the removal of such a work if the building owner "provide[d] such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal."   *Id.* § 113(d)(2)(B); *see also Castillo*, 950 F.3d at 165–66.

## II

"When interpreting a statute, we begin, as always, by giving effect to the plain meaning of the text—and, if that text is unambiguous, our analysis usually ends there as well."   *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 86 (2d Cir. 2023) (internal quotation marks and citation omitted).   "The plain

---

[6] VARA also does not prevent the building owner from removing such a work if the author consented to the installation of the work in the building before the law's effective date, June 1, 1991.   17 U.S.C. § 113(d)(1)(B); *Carter*, 71 F.3d at 83.   Any provisions pertaining to works installed prior to VARA's effective date are not pertinent here, as all relevant events took place after that date.

meaning of a statutory provision may be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Williams v. MTA Bus Co.*, 44 F.4th 115, 129 (2d Cir. 2022) (internal quotation marks and citation omitted); *see also Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) ("To discern that ordinary meaning, those words must be read and interpreted in their context, not in isolation." (internal quotation marks and citation omitted)).   "Only when the terms are ambiguous or unclear do we consider legislative history and other tools of statutory interpretation." *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018).   In determining whether statutory language is ambiguous, we "consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) (internal quotation marks and citation omitted).

Here, Kerson argues that permanently concealing his Murals with a solid barrier of acoustic panels modifies, even destroys, his work and is thus actionable under VARA.   *See* 17 U.S.C. § 106A(a)(3)(A)–(B).   The district court, relying on the ordinary meaning of the words "modification" and "destruction," rejected Kerson's attempt to stretch these statutory terms to encompass stowing artwork

behind a fixed wall.   "Modification," the district court explained, "generally refers to an incremental change to the object at issue," and "[n]o dictionary definition of modify and no conventional use of the word includes 'concealment' as a synonym."   App'x 219–20 (citing *MCI Telecommc'ns. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)).   "Destruction," it continued, also did not encompass installing a wall of acoustic panels because "destruction" typically means "to tear down or break up," with "[i]ts most compelling feature [being] the relative completeness of the change worked on its object."   App'x 223–24 (citation omitted).   For the following reasons, we agree with the district court that VLS neither modified nor destroyed the Murals by covering them with a wall of acoustic panels.

## A

Because its plain meaning is easily discerned, we begin with VARA's use of the word "destruction," which we determine to be unambiguous.   VARA affords artists the right "to prevent any destruction of a work of recognized stature," 17 U.S.C. § 106A(a)(3)(B), which Kerson construes as extending to covering a work of art, *see* Appellant's Br. 44 ("[A] wall permanently blocking the Murals can, in and of itself, be deemed to be a destruction under the statute.").   But Kerson's reading does not comport with any conventional understanding of the word

18

"destruction," as to "destroy" means to "damage (something) so thoroughly as to make unusable, unrepairable, or nonexistent; to ruin." *Destroy*, Black's Law Dictionary (11th ed. 2019); *see also Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*, No. 01 Civ. 1226 (DAB), 2005 WL 1153752, at *3 (S.D.N.Y. May 13, 2005) ("The word 'destroy' is defined as 'to tear down or break up.'" (quoting American Heritage Dictionary of the English Language (4th ed. 2000))).   There is no dispute that after the acoustic panels were affixed to the wall of the Chase Community Center, the Murals remained fully intact.   Indeed, the wall was designed so as to not touch the Murals and thus did not physically alter them whatsoever, let alone ruin them or render them unrepairable.   Thus, VLS plainly did not destroy the Murals by erecting a barrier shielding them from view.[7]

---

[7] This holding is consistent with *English v. BFC & R East 11th Street LLC*, No. 97 Civ. 7446 (HB), 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997), *aff'd on other grounds, sub nom. English v. BFC Partners*, 198 F.3d 233 (2d Cir. 1999) (unpublished table decision).   At issue in *English* was the construction of a building that, once built, threatened to completely obstruct from view (without touching) a series of murals painted onto a building on an adjacent parcel of land.   *Id.* at *1, *6.   The district court rejected the artists' assertion that "obliterating a visual artwork from view is the equivalent of destroying it, and is actionable as a matter of law[.]"   *Id.* at *6 (internal quotation marks and citation omitted). Such a holding, the court deduced, "would effectively allow building owners to inhibit the development of adjoining parcels of land by simply painting a mural on the side of their building."   *Id.*   Kerson's claim does not raise the same policy issues regarding land use, but his expansive reading of "destroy" is, in essence, the same.   As in *English*, we see no reason to contort the meaning of "destruction," as used in VARA, to extend to instances where a work is concealed, yet remains intact.

**B**

We turn next to what constitutes a "modification" under VARA.   To rehash the pertinent statutory text, VARA endows artists with the right "to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right[.]"   17 U.S.C. § 106A(a)(3)(A).   On Kerson's interpretation, "the erection of a wall permanently covering up [the] Murals, so that they cannot be seen, based solely on [VLS's] deeming the Murals offensive, is a modification, prejudicial to [his] honor or reputation."   Appellant's Br. 21.   The district court erred in its reading, Kerson stresses, "[b]y singularly focusing on its perceived definition of 'modification', *i.e.*, that it 'generally refers to an incremental change to the object at issue,'" while neglecting the effect that concealing the Murals had on his honor and reputation. *Id.*   Kerson claims that when placed in its proper context the word "modification" "must be considered in conjunction with how the modification impacts . . . the author's honor or reputation."   *Id.* at 25.   We disagree.

The word "modification" as used in VARA connotes a change to a work of art that somehow adulterates the viewing experience, presupposing that at least some portion of the work remains visible, albeit in altered form.   As set forth

below, we derive this interpretation from the plain meaning of the word "modification" and the statutory context in which it is used.   With the statutory text and context pointing in the same direction, we conclude that "modification" as employed by VARA does not encompass merely concealing an artwork from view in a manner that does not otherwise alter the work.

Beginning with its plain meaning, the word "modification," as conventionally understood, entails a change to an object that alters some portion of it without radically transforming the whole.   *See MCI Telecommc'ns. Corp.*, 512 U.S. at 225 ("Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." (citations omitted)); *see also Modification*, Merriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/modification (last visited August 17, 2023) (defining "modification" as "the making of a limited change in something").   In the context of a work of art, "modifications" clearly include certain alterations to the work itself, such as an additional brush stroke, erasure of content, or reorganization of a movable component.   Modification, as conventionally understood, does *not* include concealing a work of art behind a solid barrier, assuming the work remains intact while hidden from view.   To this point, the district court correctly noted that to

"modify" does not ordinarily "describe moving an object to a location where it cannot be seen," and "no conventional use of the word includes 'concealment' as a synonym."   App'x 220; *see also Mass. Museum of Contemp. Art Found., Inc. v. Büchel*, 593 F.3d 38, 61 (1st Cir. 2010) ("[T]he mere covering of the artwork . . . cannot reasonably be deemed an intentional act of distortion or modification of [the artist's] creation.").   In other words, just as moving a painting into storage does not "modify" the work, neither does secreting the Murals behind a wall of acoustic panels.

The statutory context supports a reading of "modification" that is cabined to perceptible changes to an artwork that affect how the work is viewed.   The word "modification" appears in § 106A(a)(3)(A) as a general term in a list of potentially actionable changes to an artwork.   *See* 17 U.S.C. § 106A(a)(3)(A) (prohibiting the "distortion, mutilation, or other modification" to a work of art). The familiar principle of *ejusdem generis* reinforces our conclusion that the phrase "other modification" does not extend to merely occluding a work behind a solid barrier.   Rather, the phrase corresponds to changes to a work of art that bear resemblance to a "distortion" or "mutilation."   *See Saxon*, 142 S. Ct. at 1789 ("[T]he *ejusdem generis* canon . . . instructs courts to interpret a general or collective term

at the end of a list of specific items in light of any common attributes shared by the specific items." (internal quotation marks, alteration, and citation omitted)); *Yates v. United States*, 574 U.S. 528, 545 (2015) ("[E]*jusdem generis* . . . counsels: Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (internal quotation marks, alterations, and citation omitted)).   To "distort" means "to twist out of the true meaning or proportion" or "to alter to give a false or unnatural picture or account." *Distort*, Merriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/distort (last visited August 17, 2023).   Similarly, to "mutilate" means "[t]o severely and violently damage" or "to render seriously defective by destroying or removing a material part of."   *Mutilate*, Black's Law Dictionary (11th ed. 2019).   The common attribute between "distortion" and "mutilation" is that they conjure actions that, to varying degrees, affect an object in ways that change how it is perceived.   Situated alongside these words, the phrase, "other modification," is naturally read to bring within VARA's reach lesser changes to an artwork that, although perhaps short of distortion or mutilation, nevertheless impact how the work is perceived.   On this reading, the wall of acoustic panels

does not "modify" the Murals because no portion of them remains visible in altered form.   Obscured by a solid barrier suspended above the surface of the wall, observers are not left with a misimpression of the Murals such that they have been "modified" for purposes of VARA.

Kerson advocates a more capacious reading of "modification," arguing that the term "is not limited to physical changes of the artwork itself, but rather includes changes in how the artwork is presented."   Appellant's Br. 24.   Kerson supports this interpretation by reference to the public presentation exception, which provides that "[t]he *modification* of a work of visual art which is the result of conservation, or of the public presentation, *including lighting and placement*, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the *modification* is caused by gross negligence."   17 U.S.C. § 106A(c)(2) (emphases added).   Kerson reads this exception as embodying a broader conception of modification because it cites "specific examples of modification that do not involve physical changes to the artwork, namely the placement of the work of visual art and the lighting conditions surrounding the work of visual art."   Reply Br. 5.   But even assuming *arguendo* that VARA extends to non-physical changes to a work of art, the text and

context of the public presentation exception belie Kerson's proposed construction in relation to covering the Murals.

First, as a textual matter, the public presentation exception specifies that a modification "*which is the result*" of a public presentation-related decision is not an actionable modification pursuant to § 106A(a)(3)(A).   VARA thus distinguishes between modifications—which, as discussed, are changes to a work of art that somehow adulterate the viewing experience—and matters of public presentation, such as lighting and placement—which may, if grossly negligent, give rise to an actionable modification.   As conceived in the public presentation exception, a choice regarding presentation can *cause* a modification, but that choice is not, in and of itself, a modification.   To illustrate the distinction, consider a painting created out of sensitive materials widely known for their propensity to discolor upon exposure to bright light and high humidity.   If the owner of the piece decided to bathe the work in bright floodlights while on display in an open-air studio located in a swamp, the resultant discoloration (but not the lighting and placement decisions) would constitute a modification of the painting.   And if this discoloration were the result of gross negligence, the public presentation exception would not shield the art owner from suit under VARA.

On this reading, "modification" for the purpose of VARA may well denote only physical changes to a work of art that alter the viewing experience. But even assuming some nonphysical changes to artwork might qualify as a "modification," the logic of the public presentation exception further counsels *against* contorting the word beyond its plain meaning to encompass merely covering a work of art. By operation of the public presentation exception, an art owner retains discretion to make decisions about how to display and conserve art after it has been purchased, so long as the owner does not act with gross negligence. As the district court observed, the exception clarifies that "[r]elated forms of presentation such as moving a work of art to a less desirable location within the museum, excluding the work from a travelling exhibit, and the range of other possible decisions about display are not actionable modifications[.]" App'x 220–21. Kerson reads the public presentation exception as expanding what it means to modify a work under VARA, but this flips the provision on its head. As just explained, the public presentation exception generally excludes from the set of actionable "modifications" changes to a work of art that flow from conservation efforts or decisions regarding public presentation. Kerson thus urges us to construe a provision that *limits* the set of actionable modifications to *expand* the

universe of such modifications.    We decline to adopt this anomalous construction.[8]

Kerson's claim that the district court adopted an erroneously "restrictive definition" of "modification" fails for the additional reason that it misconceives the interplay between the components of an actionable claim under § 106A(a)(3)(A).    Appellant's Br. 29.    Kerson argues that the district court's "narrow focus on the artwork itself without considering the impact on the author's honor or reputation is error," *id.*, but this conflates two distinct statutory requirements.    To establish liability, § 106A(a)(3)(A) requires that there be both (1) an intentional distortion, mutilation, or other modification to a work *and* (2) prejudice to an artist's honor or reputation as a consequence thereof.    Stated

---

[8] Kerson further argues that to the extent it *undercuts* his claim, the public presentation exception has no application to this case because it does not apply to immovable art, such as the Murals, which is governed by a different set of statutory provisions.    *See* 17 U.S.C. § 113(d).    Because we hold that the Law School did not modify the Murals by concealing them behind a wall of acoustic panels, we need not determine whether the public presentation exception applies.    We thus leave for another day the question whether the public presentation exception applies equally to movable and immovable art.    *Compare Phillips v. Pembroke Real Est., Inc.*, 459 F.3d 128, 140–43 (1st Cir. 2006) (explaining that "the premise of the public presentation exception is artwork that can be moved in some fashion"), *with Kelley v. Chi. Park Dist.*, 635 F.3d 290, 306–07 (7th Cir. 2011) (questioning *Phillips*'s limitation on the public presentation exception and discussing why the public presentation exception may be applicable to art that integrates its location as one of its elements).

differently, not all modifications are actionable under VARA, just the subset that prejudices an artist's honor or reputation.   Without a modification to the Murals, whether the erection of a barrier prejudiced Kerson's honor or reputation is purely academic.   The district court thus did not err in ceasing its analysis after it determined that the Law School did not modify the Murals.[9]

Finally, the reading of "modification" that we adopt today coheres with the case law on the issue.   The most analogous case is *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Büchel*, in which the First Circuit rejected an artist's VARA claim on the ground that partially covering an unfinished art installation in a museum with tarpaulins did not constitute an intentional act of distortion or modification.   593 F.3d at 61–62.   The Court explained:

> [A]lthough the installation unquestionably looked different with the tarpaulins partially covering it, . . . the mere covering of the artwork by the Museum, its host,

---

[9] In an effort to avoid this conclusion, Kerson turns to VARA's legislative history to foreground Congress's concern over protecting artists' honor and reputation, again conflating the two distinct requirements of § 106A(a)(3)(A).   But even if resorting to legislative history were necessary to ascertain the meaning of "modification" under VARA, Kerson's selected excerpts provide little guidance on the operative interpretive question.   Kerson emphasizes portions of the legislative debate demonstrating that Congress intended VARA to accommodate an appropriately flexible conception of "whether harm to honor or reputation exists" to sustain a VARA claim.   Appellant's Br. 26 (quoting H.R. Rep. No. 101-514, at 15 (1990)).   But "whether harm to honor or reputation exists" sheds no light on the distinct question of what amounts to a modification under VARA in the first place.

> cannot reasonably be deemed an intentional act of distortion or modification of Büchel's creation.    To conclude otherwise would be to say that . . . the Museum would have been subject to a right-of-integrity claim if it had partially covered the work before its formal opening to prevent visitors from seeing it prematurely.

*Id.* at 61.    To be clear, the tarps in *Büchel* only partially covered the football-field-sized art installation, prompting one observer to liken them to "hid[ing] an elephant behind a napkin."    *Id.* at 41, 46 (internal quotation marks and citation omitted).    In this way, the artist in *Büchel* may have had an even stronger VARA claim than Kerson, because some portion of the artwork remained exposed, lending support to the artist's argument that the tarps effected "an aesthetic modification of the artwork that gave . . . patrons a distorted view of it."    *Id.* at 61. Here, the acoustic panels covering the Murals leave no portion of them exposed, undercutting Kerson's claim that the Law School distorted or modified his work.[10]

---

[10] Because we determine that "modification," as used in VARA, has a readily discernible meaning based on the statutory text and context, we see no occasion, as suggested by the Law School and *amicus*, to employ the canon of constitutional avoidance to evade any potential First Amendment concern that might flow from interpreting VARA as requiring a private party to continue displaying expressive content against its will.

## C

Kerson next contends that permitting the Law School to conceal the Murals is contrary to the protection VARA affords to works incorporated into a building under 17 U.S.C. § 113(d)(1).    Again, we disagree.

The Murals fall within the ambit of § 113(d)(1) because they were rendered onto the walls of the Chase Community Center "in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)[.]"    17 U.S.C. § 113(d)(1)(A); *see also id.* § 106A(a)(3) (prohibiting prejudicial "distortion, mutilation, or other modification" and "intentional or grossly negligent destruction").    Section 113(d)(1) provides, in pertinent part, that if an artist executes a signed "written instrument . . . that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal, then the rights conferred by [§ 106A(a)(2)–(3)] shall not apply."    *Id.* § 113(d)(1)(B).[11]    As a corollary, if an artist and building

---

[11] Section 106A(a)(2), which is not relevant to this appeal, gives artists "the right to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation[.]"    17 U.S.C. § 106A(a)(2).

owner do not enter into such a written agreement, the moral rights protections of § 106A(a)(2)–(3) remain operative.

Kerson draws on, and combines, elements of these provisions to suggest a reading of VARA that extends protections to incorporated works that are unsupported by the relevant statutory text.   While, under VARA, an artist *may waive* through written agreement the rights conferred by § 106A(a)(2)–(3), *see id.* § 113(d)(1)(B), Kerson asserts that an artist *must consent* through written agreement to covering such a work, even if it is removed from view in a way that does not destroy, distort, mutilate, or otherwise modify it.   A contrary rule, according to Kerson, would effectively allow art owners to circumvent the protections of § 113(d)(1).   Simply put, Kerson argues that in the absence of a written agreement, VARA does not allow "the *de facto* removal of the Murals by permanently covering them up so that they are no longer on display."   Reply Br. 11.

Kerson overreads § 113(d)(1).   The provisions specific to incorporated works do not extend additional protections for immovable art beyond those enumerated in § 106A(a).   They merely specify circumstances in which an owner may remove an incorporated work "from the building" into which it is integrated,

despite the harm that will befall the work as a result.   *See* 17 U.S.C. § 113(d)(1)(A).

Here, however, VLS has not removed the Murals from the Chase Community

Center.   The Murals remain intact and incorporated into the building.   And

while Kerson and the Law School never entered into a written agreement

reflecting Kerson's consent to remove the Murals, this simply means that

§ 113(d)(1) does not operate to suspend the protections of § 106A(a)(2) and (3),

which apply by their ordinary terms.   Thus, VLS remains barred from

intentionally or grossly negligently destroying the Murals and from modifying

them so as to prejudice Kerson's honor or reputation.   *See id.* § 106A(a)(3)(A)–(B).

But as discussed *supra* Section II.A–B, the Law School did not violate § 106A(a)(3)

because it neither modified nor destroyed the Murals by concealing them behind

a wall of acoustic panels.   This result is no different because the Murals are

incorporated into a building.

Accordingly, § 113(d)(1) does not resuscitate Kerson's VARA claims.

### III

Finally, Kerson seeks to prevail under VARA based on the claim that even

if covering a work of art from view does not, without more, constitute a

modification or destruction of the artwork, the acoustic panels here will expose

the Murals to toxic environmental conditions that could damage them to the point

of distortion, mutilation, modification, or even destruction.   As part of the summary judgment record, Kerson offered the expert opinion of Emily Phillips ("Phillips"), an art conservation specialist, who attested that the wall of acoustic panels "presents a significant potential risk to the integrity and longevity of the murals."   App'x 149.   Phillips admitted that she had no knowledge of the panels' composition but attested that the acoustic panels, made of a "completely unknown material," (1) might "emit harmful gasses" or "unduly restrict air flow or permeability"; (2) risk creating an environment prone to temperature variances and moisture infiltration that could lead to mold growth, delamination, or other damage; and (3) obstruct visual monitoring of the Murals, thereby hampering the ability to perceive any gradual harm that may occur due to ambient conditions. App'x 146–48.   She opined that the acoustic panels are more likely than not to create ambient conditions that will damage the Murals.   *See* App'x 170.

The district court, while crediting Phillips's expert testimony, determined that the projected harm was not actionable under VARA as a modification to the artwork because it falls squarely within the statute's exception for modifications related to the passage of time.   The district court also concluded that Kerson had failed to raise a triable issue of fact as to whether the Murals will deteriorate behind

the wall so as to be destroyed.   We agree that the threatened harm to the Murals is not actionable under either a modification or destruction theory, albeit without reaching the question whether the "passage of time" exception applies.

## A

At the start, even accepting Kerson's evidence that the wall of acoustic panels might conceivably damage the Murals at some undefined point in the future, the record is devoid of evidence that the Law School in placing the panels in front of the Murals intended them to harm or otherwise modify Kerson's work. As such, we need not determine whether the exception for modifications resulting from the passage of time applies because VARA prohibits only *intentional* modifications.   *See* 17 U.S.C. § 106A(a)(3)(A) (prohibiting the "intentional distortion, mutilation, or other modification" of works of visual art).   There is no evidence of such intent on the record here.

The record is, instead, clear that the Law School, in covering the Murals, sought in no way to distort, mutilate, or modify them.   In developing the plan for a wall of acoustic panels, the Law School settled on the most cost-effective way to conceal the Murals.   *See* App'x 133–34 (describing the Law School's rejection of two pricier alternatives); App'x 135 (articulating the Law School's priorities to "cover a large wall, to have sound dampening, and that it not be see-thru [sic]").

Jeffrey Knudsen ("Knudsen"), VLS's Building and Grounds Supervisor, affirmed that "the objective in constructing . . . the cover that would utilize the acoustic panels was to come up with a design that *would not harm the mural* as the cover was being installed."   App'x 141 (emphasis added); *see also* App'x 82 (noting Knudsen's "research into panels or materials that could be used to remove the mural from sight *without harming the mural in the process*." (emphasis added)).   He further testified that he believed the panels would reduce environmental risks to the Murals, rather than enhance them.   *See* App'x 116.   And the Law School offered "to install digital humidity and temperature monitors both behind the cover structure and in the room itself" in order "to keep track of humidity and temperature near the mural surface and ensure that there is no significant deviation from ambient conditions in the upper level of Chase Hall."   App'x 116-17; *see also* App'x 140.

Without evidence to support the Law School's intent to distort, mutilate, or modify the Murals via installation of the acoustic panels, Kerson's claim under § 106A(a)(3)(A) must fail.

## B

Kerson next argues that even if the ambient conditions behind the panels will not over time result in an intentional modification to the Murals, there is a

genuine dispute as to whether ensconcing the Murals behind the wall "will cause sufficient damage to the Murals that for all practical purposes they are destroyed." Appellant's Br. 43.   We again disagree, concluding that the district court correctly rejected this argument as well.

The record provides no support for the proposition that covering the Murals behind the acoustic panels will result in their destruction.   Kerson's expert did not opine that the wall of acoustic panels was certain or even likely to create an environment that will destroy the Murals.   Rather, she provided a qualified opinion that the cover was not "consistent with best practices in the art conservation field," App'x 146, because "in general the use of an unknown material, without . . . consideration of the impact it would have on an artwork, is not best practices," App'x 163.   But while the Law School may be liable if it destroys the Murals through gross negligence, *see* 17 U.S.C. § 106A(a)(3)(B), failure to adhere to the norms of art conservation does not provide a basis on which a reasonable jury could conclude that a work of art will be destroyed.   Phillips's expert opinion thus does not bring into genuine dispute whether the Murals will suffer damage so extensive as to destroy them.

Notably, Phillips could not predict with any degree of certainty the extent of damage, if any, that may befall the Murals.   Phillips acknowledged that the acoustic panels "are a completely unknown material and *may* contain substances in the fabric, the backing, the interior core or manner of construction which *may* adversely impact . . . the murals."   App'x 147 (emphases added).   Unfamiliar with the materials used to compose the acoustic panels, she also could not "determine the permeability of the panels and how they will allow for proper air flow."   App'x 147.   Phillips conceded that she had not tested the acoustic panels and could not certify whether they would emit harmful gases, the extent to which the panels might damage the Murals, or on what timeframe any expected damage might occur.   *See* App'x 160, 164, 170.[12]   Even crediting Phillips's opinion that the conditions created by the wall may damage the Murals, the record does not

---

[12]   Phillips summarized the basis for her concerns about damage to the Murals as follows:

> You're talking about in this case, the Kerson . . . mural on an exterior wall, then setting up again with this very small air space with this acoustic panel applied to it, and you're creating a system whereby one can only presume, with the knowledge and experience that I have . . . and training, the likelihood of damage occurring.   I don't know how much, I don't know what percentage, I don't know if it's 50 percent or more; but I am just saying that there are in . . . that system, concerns for damage to occur to this painting.

App'x 168.

support the conclusion that the Murals will deteriorate to the point of destruction. Put another way, the mere possibility that the Murals face damage of an unknown extent at some unspecified point in the future does not give rise to a claim for destruction under VARA.

*     *     *

This case presents weighty concerns that pin an artist's moral right to maintain the integrity of an artwork against a private entity's control over the art in its possession.   On the facts presented here, we resolve this tension by hewing to the statutory text, which reflects Congress's conscientious balancing of the competing interests at stake.   As we have previously explained, for the protections that VARA affords artists, the statute does "not mandate the preservation of art at all costs and without due regard for the rights of others." *Carter*, 71 F.3d at 80.   Because mere concealment of the Murals neither "modifies" nor "destroys" them, the Law School has not violated any of VARA's prohibitions. As such, VARA does not entitle Kerson to an order directing the Law School to take the barrier down and continue to display the Murals.   That said, nothing in our decision today precludes the parties from identifying a way to extricate the

Murals from the Chase Community Center so as to preserve them as objects of art in a manner agreeable to all.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.

## Statutory Appendix: Text of Relevant VARA Provisions

### 17 U.S.C. § 106A - Rights of certain authors to attribution and integrity

(a) RIGHTS OF ATTRIBUTION AND INTEGRITY.—Subject to section 107 and independent of the exclusive rights provided in section 106, the author of a work of visual art—

> (1) shall have the right—
>
>> (A) to claim authorship of that work, and
>>
>> (B) to prevent the use of his or her name as the author of any work of visual art which he or she did not create;
>
> (2) shall have the right to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and
>
> (3) subject to the limitations set forth in section 113(d), shall have the right—
>
>> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
>>
>> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

(b) SCOPE AND EXERCISE OF RIGHTS.—

Only the author of a work of visual art has the rights conferred by subsection (a) in that work, whether or not the author is the copyright owner. The authors of a joint work of visual art are coowners of the rights conferred by subsection (a) in that work.

(c) EXCEPTIONS.—

> (1) The modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A).

(2) The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

(3) The rights described in paragraphs (1) and (2) of subsection (a) shall not apply to any reproduction, depiction, portrayal, or other use of a work in, upon, or in any connection with any item described in subparagraph (A) or (B) of the definition of "work of visual art" in section 101, and any such reproduction, depiction, portrayal, or other use of a work is not a destruction, distortion, mutilation, or other modification described in paragraph (3) of subsection (a).

(d) Duration of Rights.—

(1) With respect to works of visual art created on or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, the rights conferred by subsection (a) shall endure for a term consisting of the life of the author.

(2) With respect to works of visual art created before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, but title to which has not, as of such effective date, been transferred from the author, the rights conferred by subsection (a) shall be coextensive with, and shall expire at the same time as, the rights conferred by section 106.

(3) In the case of a joint work prepared by two or more authors, the rights conferred by subsection (a) shall endure for a term consisting of the life of the last surviving author.

(4) All terms of the rights conferred by subsection (a) run to the end of the calendar year in which they would otherwise expire.

(e) Transfer and Waiver.—

(1) The rights conferred by subsection (a) may not be transferred, but those rights may be waived if the author expressly agrees to such waiver in a written instrument signed by the author. Such instrument shall specifically identify the work, and uses of that work, to which the waiver applies, and the waiver shall apply only to the work and uses so identified. In the case of a joint work prepared by two or more authors, a waiver of rights under

this paragraph made by one such author waives such rights for all such authors.

(2) Ownership of the rights conferred by subsection (a) with respect to a work of visual art is distinct from ownership of any copy of that work, or of a copyright or any exclusive right under a copyright in that work. Transfer of ownership of any copy of a work of visual art, or of a copyright or any exclusive right under a copyright, shall not constitute a waiver of the rights conferred by subsection (a). Except as may otherwise be agreed by the author in a written instrument signed by the author, a waiver of the rights conferred by subsection (a) with respect to a work of visual art shall not constitute a transfer of ownership of any copy of that work, or of ownership of a copyright or of any exclusive right under a copyright in that work.

## 17 U.S. Code § 113 - Scope of exclusive rights in pictorial, graphic, and sculptural works

(a) Subject to the provisions of subsections (b) and (c) of this section, the exclusive right to reproduce a copyrighted pictorial, graphic, or sculptural work in copies under section 106 includes the right to reproduce the work in or on any kind of article, whether useful or otherwise.

(b) This title does not afford, to the owner of copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title.

(c) In the case of a work lawfully reproduced in useful articles that have been offered for sale or other distribution to the public, copyright does not include any right to prevent the making, distribution, or display of pictures or photographs of such articles in connection with advertisements or commentaries related to the distribution or display of such articles, or in connection with news reports.

(d)

(1) In a case in which—

(A) a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), and

(B) the author consented to the installation of the work in the building either before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal,

then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply.

(2) If the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), the author's rights under paragraphs (2) and (3) of section 106A(a) shall apply unless—

(A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or

(B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.

For purposes of subparagraph (A), an owner shall be presumed to have made a diligent, good faith attempt to send notice if the owner sent such notice by registered mail to the author at the most recent address of the author that was recorded with the Register of Copyrights pursuant to paragraph (3). If the work is removed at the expense of the author, title to that copy of the work shall be deemed to be in the author.

(3) The Register of Copyrights shall establish a system of records whereby any author of a work of visual art that has been incorporated in or made part of a building, may record his or her identity and address with the

Copyright Office. The Register shall also establish procedures under which any such author may update the information so recorded, and procedures under which owners of buildings may record with the Copyright Office evidence of their efforts to comply with this subsection.